**Harry L. HOSKIN, individually and as president and representative of all the members of the Associated Veterans of the Russian Railway Service Corps, Plaintiffs,**

**v.**

**Stanley RESOR, Secretary of the Army, Defendant.**

**Civ. A. No. 3089-67.**

United States District Court, District of Columbia.

March 23, 1971.

Selma W. Samols, Washington, D. C., for plaintiffs.

Mary Folliard, Asst. U. S. Atty., Washington, D. C., for defendant.

## MEMORANDUM OPINION

GASCH, District Judge.

This matter came on for hearing on cross motions for summary judgment. It has been thoroughly briefed, extensive exhibits were filed, and counsel have been heard in open Court. The Court agrees that there is no issue of material fact and concludes that plaintiffs are entitled to summary judgment as a matter of law. This suit raises the issue of whether the members of the Russian Railway Service Corps were members of the Army of the United States during World War I and whether as such they are entitled to an Honorable Discharge therefrom.

The Court takes judicial notice of the following historical facts: Plaintiffs are a group of railroad men who were recruited, mostly from the Great Northern Railroad, during the course of World War I for service in Siberia as part of a military organization officially designated as the American Expeditionary Force, Siberia.[1] The Czar's government had collapsed. The Kerensky provisional government had been recognized by the Allied Powers. Efforts were being expedited designed to maintain some semblance of pressure on the Central Powers on what was then called the Eastern Front in order to preclude the transfer of some two million German soldiers from that Front to the Western Front. One principal means of supply insofar as the Russian Forces were concerned was via the Trans-Siberian Rail-

way. The Pacific port was Vladivostok. Connections utilizing the Chinese Eastern Railroad through Harbin, China, were also under consideration. Russian railroads, particularly the Trans-Siberian, were in a chaotic state of disrepair. The key to the contemplated operation was repair and maintenance, and if possible, improvement of this vital link.[2]

Mr. Daniel Willard, then President of the Baltimore & Ohio Railroad, was appointed a member of the Advisory Commission of the Council of National Defense by President Wilson. On March 3, 1917, he was elected Chairman of this important Commission. His statement, which is set forth in the affidavit of the plaintiff Hoskin, reflects that following a conference with Sir George Bury, President of the Canadian Pacific, and at the request of the British Prime Minister David Lloyd-George and with the concurrence of President Wilson and Secretary of War Newton D. Baker, Mr. Willard was requested to name a five-man committee to go immediately to Vladivostok for the purpose of evaluating the condition of the Trans-Siberian Railway and reporting thereon to the Allied Powers. Mr. John F. Stevens was named Chairman of this committee. Col. George H. Emerson, formerly general manager of the Great Northern Railroad, became the commanding officer of plaintiffs and those similarly situated.

From the papers filed by the Government in this case, the Court finds the following undisputed material facts: Mr. Daniel Willard's letter dated September 18, 1917, addressed to the Chief of Staff of the United States Army, Gen. Hugh L. Scott, reveals that he was authorized by the Secretary of War to raise and equip a force of approximately two hundred and fifty railroad officers to go to Russia at once for the

1. See Order of Battle of the United States Land Forces in the World War, American Expeditionary Forces, Vol. I (1937), p. 387.

2. Maj. Gen. William S. Graves, Commanding General, A.E.F. Siberia, America's Siberian Adventure (1931).

purpose of acting as instructors of various divisions of the Russian Railroad. Mr. Willard's letter further revealed that the Secretary of War instructed Mr. S. M. Felton (The Director General of Railways, Corps of Engineers, United States Army), working in conjunction with the Chief of Engineers of the United States Army to arrange the details, such as furnishing these men with uniforms. Grades were provided for these railroad men from second lieutenant to colonel. Plaintiffs without exception are in the lower grades. They were given War Department forms on which to apply for commissions in the Officers Reserve Corps. They received direct commissions, photocopies of which are set forth as exhibits to plaintiff's affidavit on the stationery of the War Department, The Adjutant General's Office, which read individually as follows:

Harry Lester Hoskin,

Sir:

You are hereby informed that the President of the United States has appointed you, SECOND LIEUTENANT in the RUSSIAN RAILWAY SERVICE CORPS, organized under authority of the PRESIDENT OF THE UNITED STATES, to rank as such from November first, one thousand nine hundred and seventeen.

Immediately on receipt hereof, return the acceptance herewith enclosed, properly filled in, subscribed and attested.

/s/ Adjutant General.

Thereafter, on the 21st of January, 1920, following service in Siberia, the Adjutant General addressed the plaintiff

Lieutenant Harry L. Hoskin
c/o Chief of Engineers
Room 2709
Munitions Building
Washington, D. C.

Subject: Resignation

The Secretary of War accepted your resignation as second lieutenant in the Russian Service Corps January 4, 1920.

/s/ Adjutant General.

From the Government's papers, the following additional material facts are found:

By letter dated October 6, 1917, Brig. Gen. Black, the Army's Chief of Engineers, set forth the authorized ranks of the Russian Railway Service Corps and indicated that they were to be paid by the Russian Government. The Russian Ambassador by letter dated October 10, 1917, addressed to the Assistant Secretary of the Treasury, authorized payment to these men from funds to the credit of the Russian Government. The compensation paid plaintiffs was slightly in excess of compensation paid Army ranks generally. Plaintiffs were issued regulation Army uniforms.[3] United States Army insignia,[4] including that specified for the Corps of Engineers was authorized and was worn. The initials R.R.S. (Russian Railway Service) were also worn. They were armed with regulation Army sidearms. Upon arrival in Siberia, they assisted in the movement of troops and supplies of the Allies and the provisional or Kolchak government. They also assisted in the evacuation of troops and refugees when the Kolchak government was driven back and in the transport of the Czech-Slovak contingent through Siberia. With the collapse of the Kolchak government, these plaintiffs were evacuated from Siberia with other American troops. The last American transport left Vladivostok April 1, 1920.

On these facts Government counsel contends that these plaintiffs were not members of the United States Army or

---

3. 10 U.S.C. § 771. "Except as otherwise provided by law, no person except a member of the Army, * * * may wear— (1) the uniform, or a distinctive part of the uniform, of the Army, * * *." And see Gaston v. United States, 79 U.S. App.D.C. 37, 143 F.2d 10, cert. den. 322 U.S. 764, 64 S.Ct. 1286, 88 L.Ed. 1591 (1943).

4. *Ibid.*

any branch thereof. The Army has refused to grant these plaintiffs Honorable Discharges, with the rights appertaining thereto, to which they claim they are entitled. The Court finds it difficult under the admitted facts to agree with the Army's conclusion.

## I.

## PAYMENT

The defendant relies heavily upon the assertion that these men were paid by the Russian Government. One of the documents on which reliance is placed is the communication from Ambassador Bakmeteff to which reference has heretofore been made, authorizing payment out of credits held by the Secretary of the Treasury for the Kerensky Government. As previously pointed out, the Kerensky or provisional Government, the Ambassador of which was Mr. Bakmeteff, ceased to exist before the first contingent of the Railway Service Corps arrived in Vladivostok. Payment to plaintiffs thereafter continued but by no stretch of the imagination could it be deemed to have been payment from a nonexistent, bankrupt government.

The Court, being concerned as to what the facts actually were with respect to the payment of these men during their service in Siberia, in the uniform of the United States Army, wearing insignia of the United States Army, and serving under commissions authorized by the President of the United States and issued by the Adjutant General of the United States Army, inquired of respective counsel as to the source of the pay.

The Government has responded that the credit to which Russian Ambassador Bakmeteff referred was for $100,000,000.00 and that this sum had been provided by the United States and was authorized under provisions of the Liberty Bond Act. Of this sum, the Government says, $1,500,000.00 was allocated for the Russian Railway Service Corps.[5] The comparatively meager amounts supplied by Russian government sources, it appears, were thereafter the subject of reimbursement by the United States. The Kerensky government to which these amounts were credited ceased to exist on October 24, 1917 (November 6, 1917 New Style). The successor Bolshevist government has consistently denied responsibility for this obligation, and the file clearly reflects that no reimbursement has ever been effected.

The Government also relies upon the contention that the rate of pay for these men was slightly higher than that paid to corresponding grades in the National Army. This rate of pay, the file reflects, was fixed by Mr. Felton, Director General of the United States Railways under the Corps of Engineers, U. S. Army. It was designed to compensate those men more adequately for the pay they received in their previous civilian status working for railroads. It is noted that among the war powers conferred upon the President of the United States by the Act of May 18, 1917, H.R. 3545 of the 65th Cong., 40 Stat. 76 was authority to raise by voluntary enlistment special and technical troops as he may deem necessary (Sec. 2, p. 78). Service on courts martial by such specially selected men has been approved by the Supreme Court.[6]

Pay differentials insofar as military personnel are concerned are not unknown in the armed forces. Hazardous duty pay for airmen [7] or submarine duty

---

5. The Court has read the certified exhibits filed by the United States from the official records of the United States contained in the Archives of the United States. From a communication initialed by C. A. Decker, the representative in the United States of the Russian Railway Service Corps, it appears that a total of $6,616,132.14 was advanced by the

United States in its endeavors to rehabilitate the Siberian railways.

6. See Kahn v. Anderson, 255 U.S. 1, 7, 41 S.Ct. 224, 65 L.Ed. 469 (1920).

7. See United States v. Luskey, 262 U.S. 62, 43 S.Ct. 493, 67 L.Ed. 864 (1923), where a Navy machinist's mate was authorized 50 percent additional pay because

pay is well known to all persons with experience in the armed forces or even curiosity concerning the military service. That the Director General of the United States Railroads acting under the authority of the Chief of Engineers, U. S. Army called upon to select personnel for this hazardous service in Siberia during the course of a situation which developed into a bitter civil war between the White Russians and the Bolsheviks, would seek to pay these men at a rate slightly higher than that given to other officers of a similar grade, particularly when these men were being recruited from civilian railroad jobs, is not unusual nor unreasonable. Nor would it appear to be an adequate basis for the defendant's conclusion that because of this slightly higher pay fixed by the Army's representative that they did not serve in the Army.

Reference is also made in the Government's papers to the refusal of the Government to provide war risk insurance to the members of the Russian Railway Service Corps. General Ansell, the Acting Judge Advocate General of the Army, relied on a conclusory statement (Defendant's exhibit—letter dated October 27, 1917) that the members of the Russian Railway Service Corps were regarded as similar to the American·Red Cross. It nowhere appears that Red Cross personnel were ever provided regulation Army uniforms or armed by the U. S. Government or authorized to wear insignia of rank identical with that

given to officers of the United States Army. In fact, the Digest of Opinions of the Judge Advocate General of the Army, 1912–1940, states at page 74:

There is no authority for the War Department to commission officers of the Red Cross, and thereafter assign them to duty with the Red Cross; neither is there any authority for the War Department to induct Red Cross workers into the military service and thereafter assign them to duty with the Red Cross. 210.6, Oct. 21, 1918.

General Ansell's letter concludes with the observation that further and more accurate information [8] may develop the entitlement of the members of the Russian Railway Service Corps to war risk insurance.

## II.

### ADMINISTRATIVE CONSTRUCTION

The defendant takes the legal position that for many years, in effect ever since World War I, the War Department has administratively construed the plaintiffs' status as that of civilians. While this contemporaneous administrative construction is entitled to respect and consideration, it, nevertheless, is not controlling upon the Court.[9] Reference has heretofore been made to some of these prior opinions, particularly that of Brig. General Ansell. It is clear that his opinion was not rendered in an adversary proceeding.[10] It does represent, however, the view of the depart-

---

of his flying status. Schuh v. United States, 67 F.Supp. 984, 107 Ct.Cl. 88 (1946) (anti-submarine patrol duty); Griffin v. United States, 129 Ct.Cl. 244 (1954) (courier duty); Ford v. United States, 69 F.Supp. 332, 108 Ct.Cl. 174 (1947) (field artillery observer); Robbins v. United States, 98 Ct.Cl. 479 (erroneous revocation of flying status should retroactively be corrected).

8. Skidmore v. Swift & Co., 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124, wherein the Supreme Court commented on the weight to be given an administrative judgment, as follows:
   "The weight of such a judgment in a particular case will depend upon the

thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control."

9. Skidmore v. Swift & Co., *supra;* McElroy et al. ex rel. Guagliardo, 361 U.S. 281, 285, 80 S.Ct. 305, 4 L.Ed.2d 282 (1959); Chemical Bank New York Trust Co. v. S.S. Westhampton, D.C., 358 F.2d 574, 586, cert. den. 385 U.S. 921, 87 S.Ct. 228, 17 L.Ed.2d 145.

10. Fishgold v. Sullivan Corp., 328 U.S. 275, 290, 66 S.Ct. 1105, 90 L.Ed. 1230 (1946).

ment or agency involved. The thrust of the reasoning is that since these men were paid by the Russian government, they could not be considered to be soldiers of the United States.[11] In view of the admitted facts, the General's opinion cannot be accepted as binding on this Court. If the Government, for reasons of its own, seeks to establish such a channel whereby its own funds followed a somewhat circuitous course, the Court should not be tempted to reach the conclusion urged by the defendant that these funds were in effect Russian funds when it is plain that they were United States funds in the first instance and remained United States funds until they reached the plaintiffs during the course of their military service. The Court is of the opinion that even if the actual source of the funds used for payment of these plaintiffs was the Russian Government, this would not automatically preclude plaintiffs from being members of the Army. Examination of documents on file in the Archives of the United States made part of this record by the Government reflects, however, that during the course of service of these plaintiffs, funds originally placed to the credit of the Kerensky regime in the Treasury of the United States became exhausted and direct United States funds were made available for the payment of these men.

The Government's brief states that the Court is without jurisdiction to enter a declaratory judgment, the result of which would be to establish the status of these plaintiffs as being entitled to an Honorable Discharge.

Reliance is placed by the defendant on Orloff v. Willoughby,[12] the effect of which is that only the President may commission officers in the United States Army. Fortunately the plaintiffs and some others similarly situated have filed the official papers in which their appointments were authorized and their commissions directed by the President of the United States and carried into effect by the Adjutant General of the United States Army. The most that can be said on behalf of the defense is that the document in question is not completely identical with certain documents used for the purpose of commissioning others contemporaneously in the National Army.[13] The Court is not prepared to assume the devious conduct implied by the Government's papers, for to do so would be to impute motives to the President of the United States and those acting under his direction, which the Court is certain those officials never intended. Certainly these plaintiffs were

11. The Court notes that the West German government makes substantial monetary contributions to the expense of maintaining NATO forces, including U. S. troops in West Germany at the present time. No one would contend that payment of these funds by West Germany establishes the conclusion that U. S. troops serving in West Germany are not soldiers of the United States.

12. 345 U.S. 83, 73 S.Ct. 534, 97 L.Ed. 842 (1953).

13. See the explanation made to Robert Dudley Lewis (attached to the Hoskin affidavit) as to the difference in the form. It was represented that the form was temporary and that the regular commissions would be forwarded to Siberia; that their services were urgently needed in Siberia. Some of his co-workers had a similar experience in France. Certain-

ly the then youthful railroad workers, now the elderly plaintiffs in this case, completely unlearned in the law whose services were urgently sought by the Government of the United States during the course of a critical national emergency could not be expected to recognize the almost mythical difference in the commission forms. Railroad men who served in France under General Attebury, who was commissioned directly from his civilian status as vice president of the Pennsylvania Railroad, were given a status in the National Army never questioned by the Government. Those railroad men who served in North Russia in the Murmansk-Archangel Campaign were given the same status as those who served in France under General Attebury. The Government has never explained this apparent discrimination.

not ordered commissioned in the Russian Army, either that of Kolchak or any other Kerensky subordinate, for the President of the United States clearly had no such authority.

The remaining argument of the Government that these men were under the State Department is obviously without substance in view of their commissions which were on orders of the Adjutant General of the United States Army upon authorization of the President of the United States.

### III.

### LACHES

■ Defendant also relies on laches. This is an equitable doctrine based on the principle that equity will not aid a plaintiff whose unexcused delay would be prejudicial to the defendant.[14] Both unreasonable delay and prejudice must be shown for laches to apply. We find the delay here to be neither unreasonable nor prejudicial. Laches is applicable where plaintiffs have elected to sit on their rights and have lacked diligence in pursuing relief. That is not the case here. Though fifty years have passed since the cause of action arose, it should be remembered that mere lapse of time is not the essence of laches.[15] The plaintiffs have been persistent in seeking to obtain legislative relief, although only recently have

they instituted judicial action. They have caused the following bills [16] to be introduced in Congress, drawn for the purpose of achieving the relief now sought in this cause.

■ The Court finds that the delay has not been unduly prejudicial to the Government in that it has shown by the exhibits filed that it was able to produce extensive and detailed records, letters, and documents which concern the A.E.F. Siberia and the Russian Railway Service Corps and its members.

### IV.

### THE RELATIONSHIP BETWEEN THE PARTIES

Plaintiffs argue that a valid contract [17] existed between themselves and the then War Department, as a result of which they were commissioned in the Army, or in the alternative, that there was a constructive [18] or de facto commissioning in the Army. The defendant asserts that the persons with whom plaintiffs dealt "did not have authority to commission officers, and their representations could not bind the Government." The Court finds this position unsupported by the facts and untenable. The evidence is clear and undisputed that after volunteering for this service the plaintiffs were required to sign applications for commissions in the United States Army, addressed to the Chief of

14. Major v. Shaver, 88 U.S.App.D.C. 148, 187 F.2d 211 (1951).

15. Southern Pacific Co. v. Bogert, 250 U.S. 483, 39 S.Ct. 533, 63 L.Ed. 1099 (1919); Van Bourg v. Nitze, 128 U.S. App.D.C. 301, 388 F.2d 557 (1967).

16. S. 5034, 65th Cong.—December 19, 1918; S. 3865, 66th Cong.—December 23, 1920; H.R. 6432, 67th Cong.—June 4, 1921; H.R. 4013, 67th Cong.—January 20, 1921; H.R. 7929, 70th Cong.—February 1, 1928; H.R. 2320, 73rd Cong.—January 24, 1934; H.R. 6903, 73rd Cong.—February 5, 1934; S. 1095, 74th Cong.—January 24, 1935; S. 3461, 74th Cong.—October 9, 1935; S. 3265, 75th

Cong., 3rd Sess.—1938; H.R. 6277, 81st Cong., 1st Sess.—1950; H.R. 2782—January 19, 1951; H.R. 7562—July 25, 1955; H.R. 785—January 3, 1957; H.R. 5987—March 28, 1961.

17. In re Grimley, 137 U.S. 147, 152, 11 S.Ct. 54, 34 L.Ed. 636 (1890). But see Crenshaw v. United States, 134 U.S. 99, 10 S.Ct. 431, 33 L.Ed. 825; Wallace v. United States, 257 U.S. 541, 42 S.Ct. 221, 66 L.Ed. 360.

18. Mayborn v. Heflebower, 145 F.2d 864, 866 (5 Cir. 1944); Barrett v. Looney, 252 F.2d 588, cert. den. 357 U.S. 940, 78 S.Ct. 1390, 12 L.Ed.2d 1553 (1958).

Engineers, United States Army, and that they thereupon received on War Department stationery in response to this application an appointment in the Russian Railway Service Corps "organized under the authority of the President of the United States" and signed by the Adjutant General of the Army. Having received this appointment, plaintiffs then reported for duty, and performed their duties well and faithfully in the service and uniform of the United States in Siberia. The Court will not review the other indicia of Army service but refers to earlier mentioned undisputed facts.

At the time of the completion of their service, the plaintiffs received letters of acceptance of their resignations from the Russian Railway Service Corps, again on War Department stationery, file 201 (the official file designation used exclusively for Army officers), and signed by the Adjutant General of the Army. To hold as the Government urges, that the plaintiffs were dealing with persons whose representations could not bind the Government, is completely contrary to the established facts.

It is plain that a relationship between these plaintiffs and the United States did exist as a result of which these plaintiffs subjected themselves to orders of those in command and performed certain military duties incident to the mission of the A.E.F., Siberia. In return for this, the United States incurred certain obligations. It provided pay and allowances, regulation Army uniforms, authorized the wearing of appropriate military insignia and ultimately it terminated this status by accepting the resignations of plaintiffs. The question is, are they entitled to an Honorable Discharge?

■■ In a series of cases involving World War I soldiers to whom notices to report for induction were sent, the courts have held that such a notice presumably is received and if the individual fails to report, he is thereby subjected to prosecution.[19] A corresponding obligation is enforced insofar as the Government is concerned. If the soldier reports for service even though he does not serve as a soldier by reason of hospitalization, he is still eligible for the usual veterans benefits, including veterans preference. Hurley v. Crawley, 60 App.D.C. 245, 247, 50 F.2d 1010 (1931). Even when there is some question as to the regularity of the commissioning of the officer, if the officer actually served, he is entitled to all the emoluments of office, including an Honorable Discharge, assuming the circumstances of his service do not preclude the issuance thereof.[20] Information on the basis of which such a discharge is withheld must be revealed. Van Bourg v. Nitze, 128 U.S.App.D.C. 301, 388 F.2d 557 (1967). Here, there is no suggestion of any impropriety in the service of these plaintiffs. *Cf.* Beard v. Stahr, 370 U.S. 41, 82 S.Ct. 1105, 8 L.Ed.2d 321.

■ An irregularity in the commissioning or the promotion of an officer neither destroys nor impairs his right to the prescribed pay, including longevity or other emoluments of office. The Court of Claims in Bennett v. United States, 19 Ct.Cl. 379 (1884), was confronted with the question of the alleged irregularity in the commissioning of Captain Bennett. He had served in the Civil War both as an enlisted man and as an officer. Following wartime service his resignation was accepted, but thereafter the acceptance of the resignation was rejected and he was ordered back to active duty. Pursuant to orders, he reported for service and the question arose following final termination of his service some years later as to the rate

19. United States v. McIntyre, 4 F.2d 823 (9 Cir. 1925); Ex Parte Bergdoll, D.C., 274 F. 458.

20. Harmon v. Brucker, 355 U.S. 579, 78 S.Ct. 433, 2 L.Ed.2d 503; Bland v. Connally, 110 U.S.App.D.C. 375, 293 F.2d 852.

of his pay based on his longevity as an officer under applicable statutes as well as whether actually, because of the alleged irregularity in his orders, he could be considered as an officer. The Court of Claims set forth these principles:

In our opinion the word 'service' as used in these acts means actual service performed under color of office or other authority, without regard to any defects which might be found in the legal title of the claimant to the office or position in which he served.

It is a well-known fact that, in times of war especially, enlisted men perform service in many cases before their enlistment is fully completed by taking the required oath and being mustered in. They are prevented by necessary delays incident to the service, and without fault of their own, from consummating their technically legal enlistment, but actual service they enter upon at once. It cannot be, we think, that every officer who has been an enlisted man is required to prove a full, complete, and legal enlistment for the whole time he actually served as such, in order to have that time credited to him for longevity pay, nor that every officer is to be curtailed in the computation in the time of his service by informalities or irregularities in his appointment which do not affect the service itself. The reward which the statute is intended to give is for long-continued actual service, and not as a regular salary for the tenure of office. In that view it matters not whether the officer serves as such de jure or de facto. In either case he comes within the spirit and the meaning, and, we think, within the letter of the law. 19 Ct.Cl. at 387.

Another case which is helpful insofar as our determinations here are concerned is the case of United States v. Royer, 268 U.S. 394, 45 S.Ct. 519, 69 L.Ed. 1011 (1925). This was a World War I situation which concerned Royer's entitlement to retain pay as a major in the Medical Reserve Corps. Royer's promotion to major from 1st lieutenant was recommended by the Commanding General. The Surgeon General of the Army, to whom the recommendation was referred, recommended the appointment of Royer as Captain and this was ratified by the Secretary of War. The Adjutant General cabled the Commanding General that the appointment as major had been made. The Surgeon General notified Royer that he had been commissioned as major and requested him to submit his letter of acceptance. Royer submitted his letter of acceptance and assumed the insignia of rank of major and performed the duties appropriate to the office. Some months later he was informed that there had been a mistake in the first notice of his appointment as major. Though subsequently promoted to major, his pay was subjected to a deduction for the period prior to which the valid promotion was effected. Judgment was given in the Court of Claims for Royer and the Supreme Court affirmed. The Supreme Court said, in affirming the Court of Claims:

We need not determine whether respondent might have maintained an action against the government for unpaid salary; but, clearly, the money having been paid for services actually rendered in an office held de facto, and the government presumably having benefited to the extent of the payment, in equity and good conscience he should not be required to refund it. 268 U.S. at 398, 45 S.Ct. at 520.

▮ There is no question here but that these plaintiffs performed the military duties to which they were assigned. There is no issue as to pay. They take the position that having been appointed at the direction of the President of the United States by action of the Adjutant General of the Army they are entitled to an Honorable Discharge [21] as a necessary

---

21. 40 Stat. § 1406, p. 1151; 110 U.S.App.D.C. 375, 381, 293 F.2d 852, 858 (1961).

and proper incident to their military service in the absence of any reason for withholding such an Honorable Discharge. The Court agrees.[22]

22. "We think it must be conceded that any discharge characterized as less than honorable will result in serious injury. It not only means the loss of numerous benefits in both the federal and state systems, but it also results in an unmistak-
able social stigma which greatly limits the opportunities for both public and private civilian employment." Bland v. Connally, *supra*, at p. 381, 293 F.2d at 858.