# Status of the Director of Central Intelligence Under the National Security Intelligence Reform Act of 2004

At the time the National Security Intelligence Reform Act of 2004 takes effect, the then-current Director of Central Intelligence would not require a new appointment to the office of Director of the Central Intelligence Agency should the President wish him to serve in that position.

January 12, 2005

MEMORANDUM OPINION FOR THE DEPUTY COUNSEL TO THE PRESIDENT

The National Security Intelligence Reform Act of 2004 (the "Intelligence Reform Act") restructures the management of the intelligence community. Among other things, the Intelligence Reform Act abolishes the title "Director of Central Intelligence" ("DCI") and assigns certain of the functions currently performed by the DCI to an office entitled "Director of National Intelligence" ("DNI") and certain of those functions to an office entitled "Director of the Central Intelligence Agency" ("DCIA"). You have asked whether, at the time the Intelligence Reform Act becomes effective, the current DCI would require a new appointment to the office of DCIA should the President wish him to serve in that position. We conclude that a new appointment would not be required.

## I.

The current DCI was nominated by the President and confirmed by the Senate. Under current law, the DCI "(1) serve[s] as head of the United States intelligence community; (2) act[s] as the principal adviser to the President for intelligence matters related to the national security; and (3) serve[s] as head of the Central Intelligence Agency." National Security Act of 1947 ("NSA") § 102(a), 50 U.S.C. § 403(a) (2000).

On December 17, 2004, the President signed into law the Intelligence Reform and Terrorism Prevention Act of 2004, Pub. L. No. 108-458, 118 Stat. 3638 ("IRTPA"), title I of which is the Intelligence Reform Act. The Intelligence Reform Act will take effect some time in the next six months. IRTPA § 1097, 118 Stat. at 3698. At that time, a position with the title DCI will no longer exist; instead, there will be a DNI and a DCIA. *Id.* § 1011(a) (new NSA §§ 102(a) & 104A(a)), 118 Stat. at 3644, 3660. Both of those positions, the Intelligence Reform Act provides, "shall be appointed by the President, by and with the advice and consent of the Senate." *Id.* § 1011(a) (new NSA §§ 102(a) & 104A(a)), 118 Stat. at 3644, 3660.

You have asked whether, in light of these statutory changes, when the Intelligence Reform Act takes effect the then-current DCI would require a new appointment if the President wishes him to serve as DCIA. Our analysis of the applicable

statutory and constitutional provisions leads us to conclude that a new appointment would not be required.

## II.

Although the Intelligence Reform Act does not speak directly to this question, we believe the better reading of the statute is that it does not require a new appointment of the then-current DCI if the President wishes him to serve as DCIA. That conclusion is reinforced by the fact that a contrary reading would raise serious constitutional questions—Congress cannot remove a sitting officer except by impeachment or by abolishing the position. A comparison of the duties of the DCIA and DCI shows that the position has not been abolished. Consequently, a new appointment is not required.

## A.

## 1.

Our conclusion follows, first, from a comparison of the statutory functions and duties of the DCIA and the DCI. Such a comparison shows that the office of DCIA is substantially the same office as that of DCI, albeit with a new title and a reduction of duties. Because the office is the same and because Congress did not clearly indicate a contrary intent, we conclude that Congress did not intend to require a new appointment of the then-current DCI to serve as DCIA.

Like the current DCI, the DCIA will "(1) serve as the head of the Central Intelligence Agency" and will "(2) carry out" various other "specified" "responsibilities" related to intelligence collection. *Compare* IRTPA § 1011(a) (new NSA § 104A(c)), 118 Stat. at 3660, *with* NSA § 102(a), 50 U.S.C. § 403(a). In particular, the DCIA will:

> (1) collect intelligence through human sources and by other appropriate means, [but] shall have no police, subpoena, or law enforcement powers or internal security functions;

> (2) correlate and evaluate intelligence related to the national security and provide appropriate dissemination of such intelligence;

> (3) provide overall direction for and coordination of the collection of national intelligence outside the United States through human sources by elements of the intelligence community authorized to undertake such collection and, in coordination with other departments, agencies, or elements of the United States Government which are authorized to undertake such collection, ensure that the most effective

use is made of resources and that appropriate account is taken of the risks to the United States and those involved in such collection; and

(4) perform such other functions and duties related to intelligence affecting the national security as the President or the [DNI] may direct.

IRTPA § 1011(a) (new NSA § 104A(d)), 118 Stat. at 3660–61. All of these duties are by statute currently performed by the DCI. *See* NSA § 103(d), 50 U.S.C. § 403-3(d). Moreover, the DCIA, like the DCI, will have authority to terminate CIA employees in the interest of national security, IRTPA § 1011(a) (new NSA § 104A(e)), 118 Stat. at 3661; NSA § 104(h), 50 U.S.C. § 403-4(h) (2000 & Supp. III 2004); and to coordinate relationships with the intelligence services of foreign governments, IRTPA § 1011(a) (new NSA § 104A(f)), 118 Stat. at 3661; NSA § 104(e), 50 U.S.C. § 403-4(e).

Likewise, section 1077—a "conforming amendment[]"—amends the Central Intelligence Agency Act of 1949 (50 U.S.C. §§ 403a–403s) to provide that the same authorities granted to the DCI under that Act will belong to the DCIA, including authorities related to procurement, travel and allowances, personnel, property, admission of essential aliens, appropriations, and acceptance of gifts, among others. 118 Stat. at 3695. Indeed, section 1081(b) of the Intelligence Reform Act provides:

> Any reference to the Director of Central Intelligence or the Director of the Central Intelligence Agency in the Director's capacity as the head of the Central Intelligence Agency in any law, regulation, document, paper, or other record of the United States shall be deemed to be a reference to the Director of the Central Intelligence Agency.

118 Stat. at 3696.

The DCIA, to be sure, will not serve as head of the intelligence community or as principal adviser to the President for intelligence matters; those roles—greatly enhanced under the Intelligence Reform Act—will be assigned to the newly established DNI. *See id.* § 1011 (new NSA §§ 102 *et seq.*). Yet, *every* duty and responsibility to be discharged by the DCIA under the Intelligence Reform Act is presently discharged by the DCI in his role as head of the CIA, and this broad substantive continuity clearly indicates that the office of DCIA is the same office as that of the DCI, albeit with reduced duties and a new title.

Neither a new title, nor reduced duties, nor a requirement that the DCIA be appointed "by the President by and with the advice and consent of the Senate" implies an intent to create a new office or otherwise require a new appointment. An office is more than a title; it is essentially a collection of duties and authorities. *See United States v. Hartwell*, 73 U.S. (6 Wall.) 385, 393 (1868); *The Constitutional Separation of Powers Between the President and Congress*, 20 Op. O.L.C. 124, 140–42 (1996) ("*Separation of Powers*"); Edward Corwin, *The President:*

*Office and Powers, 1789–1984*, at 85 (5th ed. 1984). Even where the title changes, the office may continue if the duties and authorities continue in a recognizable form, particularly where the duties and authorities are simply reduced. And if the office was Senate-confirmed under its former title, Congress by simply continuing that requirement when changing the title and reducing duties does not indicate an intent to create a new office and thereby require a new appointment; rather, it merely retains a characteristic of the prior position.

Indeed, Congress has frequently changed an office's title, reduced its duties or authorities, and retained a requirement of Senate confirmation under analogous circumstances—without any suggestion that it thereby created a new office or otherwise purported to require a new appointment. For example, in the National Security Act of 1947, Congress renamed the Secretary of War the Secretary of the Army; reduced his powers by transferring his control over the Air Force to a new Secretary of the Air Force; and retained the requirement of Senate confirmation. Yet that act did not suggest that the Secretary of War would have to be reappointed, and the incumbent Secretary of War continued in office as Secretary of the Army without his name being resubmitted to the Senate. *See* NSA §§ 205(a), 207(f), 61 Stat. 495, 501, 503; 93 Cong. Rec. 9393 (July 19, 1947) (Kenneth Royall confirmed as Secretary of War; no subsequent submission for him to serve as the Secretary of Army after the NSA took effect). Likewise, in 1979, Congress renamed the Secretary of Health, Education, and Welfare the Secretary of Health and Human Services; reduced her powers by transferring her education duties to a new Secretary of Education; and retained the requirement of Senate confirmation. Again, the statute did not suggest any need for a new appointment, and the incumbent Secretary of Health, Education, and Welfare continued in office as Secretary of Health and Human Services without her name being resubmitted to the Senate. *See* Department of Education Organization Act, Pub. L. No. 96-88, §§ 301, 509, 93 Stat. 668, 677–79, 695 (1979); 125 Cong. Rec. 21137, 21143 (July 27, 1979) (Patricia Roberts Harris confirmed as Secretary of Health, Education, and Welfare; no subsequent submission for her to serve as Secretary of Health and Human Services after Organization Act took effect). *See also Crenshaw v. United States*, 134 U.S. 99, 101, 109 (1890) (holding that law providing that "all the undergraduates at the Naval Academy shall hereafter be designated and called 'naval cadets'" instead of "'cadet midshipmen,'" and modifying the scope of their duties by restricting the circumstances under which they would be commissioned upon graduation, did not create a new office or appoint its occupants).

Similarly, Congress in creating the Department of Defense reduced the powers of three formerly principal officers—the Secretaries of the Army, Navy, and Air Force—and put them under the control of the secretary of the newly created Department of Defense (while retaining their titles and requirement to be Senate-confirmed) without requiring reappointment. *See* National Security Act Amendments of 1949, Pub. L. No. 81-216, §§ 3, 4, 10(a), 12(f), 63 Stat. 578, 579, 585. Congress has in other ways reduced duties without any suggestion that it was

creating a new office. *See, e.g.*, Act of April 30, 1798, ch. 35, § 5, 1 Stat. 553, 554 (reducing powers of the Secretary of War by transferring certain of them to the secretary of the newly created Navy Department, without requiring reappointment of the War Secretary); *cf. United States v. San Jacinto Tin Co.*, 125 U.S. 273, 284 (1888) (assuming that the "legislative body which created the office" may place "restrictions . . . upon the exercise of . . . authority by" that officer, without it becoming a new office). It also has changed titles without any suggestion that it was creating a new office. *See, e.g.*, Act of Sept. 15, 1789, ch. 14, § 1, 1 Stat. 68, 68 (redesignating Secretary for the Department of Foreign Affairs as Secretary of State, and somewhat increasing duties, without requiring reappointment).

Given that the DCIA position appears, based on the duties, transitional provisions, and historical examples discussed above, to be a continuation of the office of DCI, as head of the CIA, one would expect Congress to have clearly conveyed its purpose if it nevertheless meant to require the then-current DCI to be reappointed in order to serve as the DCIA. By way of comparison, when Congress passed legislation requiring Senate confirmation for the pre-existing positions of Director and Deputy Director of the Office of Management and Budget (legislation that President Nixon vetoed), Congress expressly provided that "no individual shall hold either such position thirty days after [the enactment] date unless he has been so appointed." S. 518, 93d Cong. (1973). Indeed, it was primarily this provision (discussed further below) that led the President to veto the bill. *See* Senate Confirmation of OMB Director and Deputy Director: The President's Message to the Senate Vetoing Bill Requiring Senate Confirmation of the Two Positions, 9 *Weekly Comp. Pres. Doc.* 681 (May 18, 1973) ("Senate Confirmation of OMB Director and Deputy Director").

### 2.

The Intelligence Authorization Act for Fiscal Year 2005, Pub. L. No. 108-487, 118 Stat. 3939 (2004) (the "Authorization Act") does not change our conclusion. Section 803(b) of the Authorization Act states:

> (1) During the period beginning on the date of the enactment of this Act and ending on the date of the appointment of the Director of the Central Intelligence Agency under section 104A of the National Security Act of 1947, as amended by section 1011(a) of the National Security Intelligence Reform Act of 2004, the Director of Central Intelligence may, acting as the head of the Central Intelligence Agency, discharge the functions and authorities provided in this Act, and the amendments made by this Act, to the Director of the Central Intelligence Agency.

> (2) Upon the appointment of an individual as Director of the Central Intelligence Agency under section 104A of the National Security Act

> of 1947, as so amended, any reference in this Act, or in the classified annex to accompany this Act, to the Director of Central Intelligence as head of the Central Intelligence Agency shall be deemed to be a reference to the Director of the Central Intelligence Agency.

*Id.* § 803(b), 118 Stat. at 3962–63. Section 803(a) provides the same authority for the DCI with respect to the functions and authorities of the DNI under the Authorization Act. The conferees' joint explanatory statement on section 803 indicates, consistently with the terms of section 803 itself, that it was meant to "clarif[y] how certain authorities shall be exercised, and who shall exercise them, during the transitional period between enactment of this Act, its effective date, the appointment of certain officers, and the enactment and effective date of the [Intelligence Reform Act]." H.R. Conf. Rep. No. 108-798, at 34 (2004). Presumably this language was necessary because, as section 803(b)(1) suggests, the Authorization Act takes effect upon enactment and refers throughout to the DNI and DCIA, yet the Intelligence Reform Act, which creates those titles, does not take effect until sometime later. *See id.*

In view of section 803's language and purpose, we do not believe it fairly can be read together with the Intelligence Reform Act to require a new appointment simply because it provides (in section 803(b)(1)) who may exercise certain authority under the Authorization Act in the transitional period until "the appointment" of a DCIA and (in section 803(b)(2)) how "any" references to the DCI remaining in the Authorization Act should be read "[u]pon the appointment" of a DCIA. Section 803's operative terms relate to the Authorization Act, not the Intelligence Reform Act. It provides, in permissive terms, that the DCI "may" "discharge the functions and authorities provided in this Act"—i.e., provided in the Authorization Act—during the transition period. We would not expect Congress to attempt to require a new appointment under a separate piece of legislation in such an obscure manner, especially with respect to such an important office.

Moreover, section 803 is a "savings provision[]." Pub. L. No. 108-487, § 803, 118 Stat. at 3962 (title of section). Its purpose is to ensure that some officer (the DCI) is able to exercise the authorities granted under the Authorization Act to the DNI and DCIA, not to restrict or otherwise address the President's authority to retain the current officer charged with running the CIA. In view of this purpose, the reference in section 803(b)(1) to "the date of the appointment of the [DCIA]" is best read to mean "the date on which all actions necessary to create and fill the office of DCIA have been taken." If the current DCI remains in his current office, that date is the effective date of the Intelligence Reform Act. By contrast, because the DNI, unlike the DCIA, is a new office, the appointment requires both the Intelligence Reform Act to take effect and the President to nominate, and the Senate to confirm, a new officer as the DNI. The broad language of section 803(b), in referring to appointment, was necessary to take account of the possibility that

the then-current DCI would not remain in office until the Intelligence Reform Act went into effect; it was not intended to require a new appointment in the event he did.

## B.

Our conclusion is reinforced by the fact that a contrary conclusion would raise serious constitutional doubts. As the Supreme Court held in *Myers v. United States*, 272 U.S. 52 (1926), the Constitution vests in the President, to the exclusion of Congress, the authority to remove an officer of the United States before the expiration of his term. There are two recognized exceptions: Congress may remove an officer through impeachment, and Congress may abolish an office altogether, thereby effectively removing the officer. *See Morrison v. Olson*, 487 U.S. 654, 686 (1988) ("the essence of the decision in *Myers* was the judgment that the Constitution prevents Congress from 'draw[ing] to itself . . . the power to remove'"); *Bowsher v. Synar*, 478 U.S. 714 (1986) (holding that officers of the United States may not be removed by Congress other than through impeachment). Furthermore, Congress may not accomplish a removal through "ripper" legislation, whereby Congress ostensibly abolishes an office while simultaneously recreating it and requiring a new appointment. *See Constitutionality of Proposed Legislation Requiring Renomination and Reconfirmation of Executive Branch Officers Upon the Expiration of a Presidential Term*, 11 Op. O.L.C. 25, 26 (1987). For example, in vetoing the bill, mentioned above, requiring the incumbent Director and Deputy Director of the Office of Management and Budget to be reappointed subject to Senate confirmation, President Nixon explained:

> I do not dispute Congressional authority to abolish an office or to specify appropriate standards by which the officers may serve. When an office is abolished, the tenure of the incumbent in that office ends. But the power of the Congress to terminate an office cannot be used as a back-door method of circumventing the President's power to remove. With its abolition and immediate re-creation of two offices, [this bill] is a device—in effect and perhaps in intent—to accomplish Congressional removal of the incumbents who lawfully hold those offices.

Senate Confirmation of OMB Director and Deputy Director, 9 *Weekly Comp. Pres. Doc.* at 681. That veto was sustained. 119 Cong. Rec. 16503, 16764 (1973). The following year, Congress passed legislation requiring Senate confirmation of any future Director or Deputy Director of the Office of Management and Budget, but not the incumbent officers. That bill was approved. Act of Mar. 2, 1974, Pub. L. No. 93-250, 88 Stat. 11.

While the DCIA under the Intelligence Reform Act is not the exact recreation of the DCI—as its powers are reduced—it is, as explained above, the clear

continuation of that office in its capacity as head of the CIA. Thus, the same constitutional defect would obtain here were the statute interpreted to require a new appointment. The Constitution does not permit Congress to remove an officer while continuing his office, even with somewhat reduced duties.[1]

In view of these serious constitutional doubts, even if the statutory analysis were substantially less clear, we would avoid interpreting the Intelligence Reform Act to require a new appointment for the then-current DCI. "[W]here an otherwise acceptable construction of a statute would raise serious constitutional problems," it is appropriate to "construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." *See Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988).

## C.

We have also considered, and rejected, the possibility that the DCI position instead continues as the DNI. While the DNI position resembles the DCI in significant respects (like the DCI, the DNI will serve as head of the intelligence community and as the principal adviser to the President on intelligence matters related to national security), the responsibilities and authority of the DNI in that role are considerably greater than the DCI's. Indeed, the desire to create a more robust head of the intelligence community was a driving force behind the legislation. *See* H.R. Conf. Rep. No. 108-796, at 241 (2004) ("This legislation in part implements the recommendations of the . . . '9/11 Commission' . . . . includ[ing] reorganization of the U.S. Intelligence Community by creating an empowered Director of National Intelligence"). By contrast, as noted above, all of the DCIA's responsibilities and authority as head of the CIA are currently exercised by the DCI.

Congress provided that the current DCI may not serve as *both* the DNI and the DCIA: The "individual serving in the position of Director of National Intelligence," the Intelligence Reform Act states, "shall not, while so serving, also serve as the Director of the Central Intelligence Agency or as the head of any other element of the intelligence community." IRTPA § 1011(a) (new NSA § 102(c)), 118 Stat. at 3644. Given that Congress clearly intended to prohibit the current DCI from serving as both the DNI and the DCIA, that the functions of the DCIA are nearly identical to the current functions of the DCI as head of the CIA, and that the functions of the DNI are substantially different from the current functions of the DCI as head of the intelligence community, the statute most naturally suggests that

---

[1] As discussed below, there may be cases where the *addition* of duties to an office will result in the establishment of a new office requiring a new appointment. We do not believe that the mere *reduction* of duties can ever result in a new office requiring a new appointment. We need not definitively resolve this issue, however. It is clear that the removal of certain duties from the position of DCI here does not render the position of DCIA a new office requiring a new appointment for constitutional purposes.

the office of DCI is continued in the office of DCIA, albeit with a new title and reduced responsibilities, and not in the office of DNI.

We need not—and do not—decide whether the result would have been different if, instead of establishing two positions (the DCIA and the DNI), the Intelligence Reform Act had simply assigned the authorities of the new DNI to the existing DCI. We decide only that where, as here, the Intelligence Reform Act establishes two positions, one of which (the DCIA) exercises only powers currently exercised by the pre-existing office and the other of which (the DNI) exercises considerable additional powers, it is the former that is the continuation of the pre-existing office.[2]

Accordingly, we conclude that when the Intelligence Reform Act takes effect the then-current DCI would not require a new appointment to serve as DCIA.

C. KEVIN MARSHALL
*Acting Deputy Assistant Attorney General*
*Office of Legal Counsel*

---

[2] Constitutional concerns are relevant to this conclusion as well—here, concerns related to the Appointments Clause. U.S. Const. art. II, § 2. It is well established that "a statute creating a new office and conferring it and its duties on the incumbent of an existing office would be unconstitutional under the Appointments Clause." *Separation of Powers*, 20 Op. O.L.C. at 157. As a corollary, Congress may not "alter the duties and powers of existing offices . . . to achieve substantially the same result." *Id.*; *see Shoemaker v. United States*, 147 U.S. 282, 300 (1893) ("[W]hile Congress may create an office, it cannot appoint the officer."); *Weiss v. United States*, 510 U.S. 163, 174 (1994) (Congress may not "circumvent[] the Appointments Clause by unilaterally appointing an incumbent to a new and distinct office"). But where Congress has simply "increase[d] the power and duties of" positions that continue to exist, and the new duties are "germane to the offices already held by" the incumbents, the Court has found no infirmity. *Shoemaker*, 147 U.S. at 301; *see also id.* at 289 (Congress may "entrust the performance of particular duties to officials already charged with duties of the same general description") (describing holding of lower court); *Weiss*, 510 U.S. at 174–76; *id.* at 195–96 (Scalia, J., concurring in part and concurring in judgment). This Office has concurred in that view. *See Separation of Powers*, 20 Op. O.L.C. at 157–59. In this case, although the "additional duties" of the DNI appear to be "germane" to those of the DCI, *see Shoemaker*, 147 U.S. at 301, the additions are considerable. There is at least a question whether Congress could confer such additions on the officer who is currently DCI. *Cf. Separation of Powers*, 20 Op. O.L.C. at 158 (in discussing germaneness test, considering whether officers' functions with the additional duties "could be said" to have been "'within the contemplation of those who were in the first place responsible for their appointment and confirmation'") (quoting *Legislation Authorizing the Transfer of Federal Judges From One District to Another*, 4B Op. O.L.C. 538, 541 (1980)); *Shoemaker*, 147 U.S. at 301 (finding new duties neither "dissimilar to" *nor* "outside the sphere of" prior duties); *Olympic Fed. Sav. & Loan Ass'n v. Dir., Office of Thrift Supervision*, 732 F. Supp. 1183, 1193 (D. D.C. 1990) (finding violation where Congress largely continued powers of three-person board but consolidated them in single, designated, pre-existing officer). By contrast, the reduction or limitation of duties does not create the risk of a congressional appointment. *See Separation of Powers*, 20 Op. O.L.C. at 157 n.92. Thus, by resolving the statutory question as we do, we avoid the need to address a possible constitutional problem.