## CRENSHAW *v.* UNITED STATES.

### APPEAL FROM THE COURT OF CLAIMS.

No. 1081. Argued January 6, 1890. — Decided March 3, 1890.

The provision in the naval appropriation act of August 5, 1882, c. 391, § 1, which directs, in certain cases, the honorable discharge of naval cadets from the navy, with one year's sea pay, is not in conflict with the contract clause of the Constitution of the United States.

An officer in the army or navy of the United States does not hold his office by contract, but at the will of the sovereign power.

It is not within the power of a legislature to deprive its successor of the power of repealing an act creating a public office.

THIS was an action, brought by the appellant, James D. Crenshaw, in the Court of Claims, for the purpose of recovering an alleged balance of $3763.66 due him on account of salary as a midshipman in the United States navy. The Court of Claims dismissed the appellant's petition, 24 C. Cl. 57; and an appeal from that judgment brought the case here.

The material facts in the case were as follows: In September, 1877, the appellant was appointed a cadet midshipman at the Naval Academy. At that time the provisions of the Revised Statutes in force and pertinent to this inquiry were as follows:

"Sec. 1520. The academic course of cadet midshipmen shall be six years.

"Sec. 1521. When cadet midshipmen shall have passed successfully the graduating examination at the academy, they shall receive appointments as midshipmen and shall take rank according to their proficiency as shown by the order of their merit at date of graduation."

"Sec. 1556. The commissioned officers and warrant officers on the active list of the navy of the United States, and the petty officers, seamen," etc., "shall be entitled to receive annual pay at the rates herein stated after their respective designations: . . . Midshipmen, after graduation, when at sea, one thousand dollars; on shore duty, eight hundred dollars; on leave or waiting orders, six hundred dollars. Cadet midshipmen, five hundred dollars."

"Sec. 1229. The President is authorized to drop from the rolls of the army for desertion any officer who is absent from duty three months without leave; and no officer so dropped shall be eligible for reappointment. And no officer in the military or naval service shall in time of peace be dismissed from service except upon and in pursuance of the sentence of a court-martial to that effect, or in commutation thereof."

The appellant accepted the appointment and entered on his studies at the academy. He completed the course of four years, and after passing a successful examination received a certificate from the academic board in the following words, to wit:

"This certifies that Cadet Midshipman James D. Crenshaw has completed the prescribed course of study at the United States Naval Academy, and has successfully passed the required examination before the academic board preparatory to the two years' course afloat.

"June 10, 1881."

On the 25th of August following, appellant was ordered to sea by the Navy Department, and directed to report for duty on board the steamer Pensacola. This he did. While he was serving on that steamer, under the aforesaid order, Congress passed an act, approved August 5, 1882, being the naval appropriation act, in which occurs this proviso :

" That hereafter there shall be no appointments of cadet midshipmen or cadet engineers at the Naval Academy, but in lieu thereof naval cadets shall be appointed from each Congressional district and at large, as now provided by law for cadet midshipmen, and all the undergraduates at the Naval Academy shall hereafter be designated and called ' naval cadets ;' and from those who successfully complete the six years' course, appointments shall hereafter be made as it is necessary to fill vacancies in the lower grades of the line and engineer corps of the navy and of the marine corps : *And provided further,* That no greater number of appointments into these grades shall be made each year than shall equal the number of vacancies which has occurred in the same grades during the preceding year ; such appointments to be made from the graduates of the year, at the conclusion of their six years' course, in the order of merit, as determined by the academic board of the Naval Academy; the assignment to the various corps to be made by the Secretary of the Navy upon the recommendation of the academic board. But nothing herein contained shall reduce the number of appointments from such graduates below ten in each year, nor deprive of such appointment any graduate who may complete the six years' course during the year eighteen hundred and eighty-two. And if there be a surplus of graduates, those who do not receive such appointment shall be given a certificate of graduation, an honorable discharge, and one year's sea pay, as now provided by law for cadet midshipmen, etc., etc." 22 Stat. 284, 285, c. 391.

As stated above, this statute was passed while appellant was engaged in his service on the Pensacola. He continued on that vessel until the 14th of March, 1883, when he was ordered to report to the superintendent of the Naval Academy

for examination.   He proceeded to the academy,  passed his final examination successfully, and, on the 15th of June, 1883, received from the academic board his certificate of graduation, reciting that, " We, the academic board of the United States Naval Academy, having thoroughly examined Naval Cadet James D. Crenshaw on all subjects, theoretical and practical, taught at this institution, and having found him proficient in each, do hereby, in conformity with the law, grant to him this certificate of graduation.   June 15, 1883."

On the 23d of June following he received this order :

" Navy Department, Bureau of Navigation and Office of Detail.

" Washington, June 23, 1883.

" Sir : You are hereby detached from the Naval Academy ; proceed home and regard yourself waiting orders.

" By direction of the Secretary of the Navy.

" Respectfully,      J. E. WALKER, *Chief of Bureau.*"

On the 26th of the same month an order, as follows, was issued :

" Sir : Having successfully completed your six years' course at the United States Naval Academy, and having been given a certificate of graduation by the academic board, but not being required to fill any vacancy in the service happening during the year preceding your graduation, you are hereby discharged from the 30th of June, 1883, with one year's sea pay, as prescribed by law for cadet midshipmen, in accordance with the provisions of the act approved August 5, 1882.

" Respectfully,   W. E. CHANDLER, *Secretary of the Navy.*"

" Naval Cadet James D. Crenshaw, U. S. Navy."

Since the date of that order appellant has not been called on to do duty, and has not received any pay except that credited on his claim.   In this state of the case he claimed that he was still a midshipman in the naval service, and, as such, entitled to pay.   This claim was based upon the following propositions :

(1) That when he accepted the appointment of cadet midshipman he became an officer of the navy, and, as such, entitled to the benefits of section 1229, and Art. 36 of section 1624, (which is to the same effect,) of the Revised Statutes; that such acceptance constituted a statutory contract with the United States based on a valuable consideration, under which he was entitled to hold the office for life, unless removed by sentence of a court-martial, or in commutation thereof;

(2) That he was not, therefore, discharged by competent authority — because, first, since the reënactment by Congress in 1874 of section 1229 and Art. 36 of section 1624 of the Revised Statutes, neither Congress, the Secretary of the Navy, nor any department of the government was competent in time of peace to discharge an officer from the naval service;

(3) That, independently of the act of July 13, 1866, 14 Stat. 92, c. 176, § 5, (section 1229 and Art. 36 of section 1624 aforesaid,) the act of 1882 is unconstitutional, as applied to him, for the reason that he held an office by contract with the United States, and was entitled on graduation to be a midshipman to serve for life or during good behavior;

(4) That not only was the act of August 5, 1882, inoperative, as to him, for the reason stated, but also for the further reason that to apply it to his class would be to make Congress appoint to the office of naval cadet all such students as were in his situation; but that while Congress had the power, under the Constitution, to create the office, it did not have the power to designate the officers, that being the constitutional duty of the executive; and

(5) That the case of appellant did not fall within the terms of the act of 1882; that he was not at the date of its passage an undergraduate of the academy, but had graduated; and that, therefore, his discharge was not authorized by that act.

*Mr. H. O. Claughton* (with whom was *Mr. Rodolphe Claughton*, on the brief) for appellant.

*Mr. Assistant Attorney General Maury* for appellees.

MR. JUSTICE LAMAR, having made the foregoing statement, delivered the opinion of the court.

The primary question in this case, one which underlies the first, second and third of appellant's propositions stated above, is, whether an officer appointed for a definite time or during good behavior had any vested interest or contract right in his office of which Congress could not deprive him? The question is not novel. There seems to be but little difficulty in deciding that there was no such interest or right. The question was before this court in *Butler* v. *Pennsylvania*, 10 How. 402, 416. In that case Butler and others, by virtue of a statute of the State of Pennsylvania, had been appointed canal commissioners for a term of one year, with compensation at four dollars per diem; but during their incumbency another statute was passed, whereby the compensation was reduced to three dollars; and it was claimed their contract rights were thereby infringed. The court drew a distinction between such a situation and that of a contract, by which "perfect rights, certain definite, fixed private rights of property, are vested." It said : " These are clearly distinguishable from measures or engagements adopted or undertaken by the body politic or state government for the benefit of all, and from the necessity of the case, and according to universal understanding, to be varied or discontinued as the public good shall require. The selection of officers, who are nothing more than agents for the effectuating of such public purposes, is matter of public convenience or necessity, and so, too, are the periods for the appointment of such agents; but neither the one nor the other of these arrangements can constitute any obligation to continue such agents, or to reappoint them, after the measures which brought them into being shall have been found useless, shall have been fulfilled, or shall have been abrogated as even detrimental to the well-being of the public. The promised compensation for services actually performed and accepted, during the continuance of the particular agency, may undoubtedly be claimed, both upon principles of compact and of equity ; but to insist beyond this on the perpetuation of a public policy either useless or detrimental, and upon a reward for acts neither desired nor performed, would appear to be reconcilable with neither common justice nor common sense. The establishment of such

a principle would arrest necessarily everything like progress or improvement in government; or if changes should be ventured upon, the government would have to become one great pension establishment on which to quarter a host of sinecures. . . . It follows, then, upon principle, that, in every perfect or competent government, there must exist a general power to enact and to repeal laws ; and to create, and change or discontinue, the agents designated for the execution of those laws. Such a power is indispensable for the preservation of the body politic, and for the safety of the individuals of the community. It is true, that this power, or the extent of its exercise, may be controlled by the higher organic law or constitution of the State, as is the case in some instances in the state constitutions, and as is exemplified in the provision of the federal Constitution relied on in this case by the plaintiffs in error, and in some other clauses of the same instrument; but where no such restriction is imposed, the power must rest in the discretion of the government alone. . . . We have already shown, that the appointment to and the tenure of an office created for the public use, and the regulation of the salary affixed to such an office, do not fall within the meaning of the section of the Constitution relied on by the plaintiffs in error; do not come within the import of the term *contracts*, or, in other words, the vested, private personal rights thereby intended to be protected. They are functions appropriate to that class of powers and obligations by which governments are enabled, and are called upon, to foster and promote the general good; functions, therefore, which governments cannot be presumed to have surrendered, if indeed they can under any circumstances be justified in surrendering them."

The case of *Newton* v. *Commissioners*, 100 U. S. 548, 559, is in point. That was a controversy over the projected removal of a county seat ; and the statute relied on by the objectors provided that before the seat of justice should be considered as permanently established at the town of Canfield, the citizens thereof should do certain things, all of which were admitted to have been duly done. The objectors, therefore, claimed a contract right that the county seat should remain

at Canfield. This court said : " The legislative power of a State, except so far as restrained by its own constitution, is at all times absolute with respect to all offices within its reach. It may at pleasure create or abolish them, or modify their duties. It may also shorten or lengthen the term of service. And it may increase or diminish the salary or change the mode of compensation. The police power of the States, and that with respect to municipal corporations, and to many other things that might be named, are of the same absolute character ;" citing Cooley Const. Lim. pp. 232, 342 ; *The Regents* v. *Williams*, 4 G. & J. 321 [*Que.* 9 G. & J. 365]. " In all these cases there can be no contract and no irrepealable law, because they are ' governmental subjects,' and hence within the category before stated. They involve *public interests*, and legislative acts concerning them are necessarily *public laws*. Every succeeding legislature possesses the same jurisdiction and power with respect to them as its predecessors. The latter have the same power of repeal and modification which the former had of enactment, neither more nor less. All occupy, in this respect, a footing of perfect equality. This must necessarily be so in the nature of things. It is vital to the public welfare that each one should be able at all times to do whatever the varying circumstances and present exigencies touching the subject involved may require. A different result would be fraught with evil."

In *Stone* v. *Mississippi*, 101 U. S. 814, 820, considering the power of a legislature to grant an irrepealable charter, for a consideration, to a lottery company, the court said : " The power of governing is a trust committed by the people to the government, no part of which can be granted away. The people, in their sovereign capacity, have established their agencies for the preservation of the public health and the public morals, and the protection of public and private rights. These several agencies can govern according to their discretion, if within the scope of their general authority, while in power ; but they cannot give away nor sell the discretion of those that are to come after them, in respect to matters the government of which, from the very nature of things, must

'vary with varying circumstances.'" See, also, *Hall* v. *Wisconsin*, 103 U. S. 5; *United States* v. *Fisher*, 109 U. S. 143. Nor is the holding of this court singular. Numerous decisions to the same effect are to be found in the state courts. *The People* v. *Morris*, 13 Wend. 325; *Commonwealth* v. *Bacon*, 6 S. & R. 322; *Commonwealth* v. *Mann*, 5 W. & S. 403, 418; *A. J. Hyde* v. *The State*, 52 Mississippi, 665; *The State of Mississippi* v. *Smedes and Marshall*, 26 Mississippi, 47; *Turpen* v. *Board of Commissioners of Tipton Co.*, 7 Indiana, 172; *Haynes* v. *The State*, 3 Humphrey, 480; *Benford* v. *Gibson*, 15 Alabama, 521.

In *Blake* v. *United States*, 103 U. S. 227, the fact is adverted to and the opinion of the Attorney General in Lansing's case, 6 Opinions Attys. Gen. 4, quoted approvingly to the effect that in this respect of official tenure there is no difference in law between officers in the army and other officers of the government.

Applying the above principles, it remains to say that we know of no instance in which their assertion is more imperatively demanded by the public welfare than in this case, and such others as this. If the position taken by the appellant is correct, then a logical and unavoidable result is, that our country, if ever we are so unfortunate as to be again involved in war, will be compelled, after the treaty of peace, to maintain the entire official force of the army and navy, and a host of sinecurists in full pay so long as they shall live; either that or to disband the army and navy before the peace shall be made, even this wholly inadmissible alternative being legally possible from one of appellant's positions. It is impossible to believe that such a condition of affairs was ever contemplated by the framers of our organic or statute law.

The effect of the authorities cited above, is in no respect modified by section 1229 or by Art. 36 of section 624 of the Revised Statutes. In the first place, if it were granted that those sections mean what appellant claims for them — if they mean beyond question that one appointed as a cadet shall never be dismissed by authority of either the executive or the legislature, or by both in conjunction — yet that fact would

make no difference. The great question of protection to contract rights and vested interests, which forms such an interesting and important feature of our constitutional law, is not dominated by the turn of a phrase. Our courts, both state and national, look on these questions through the form to the substance of things; and, in substance, a statute under which one takes office, and which fixes the term of office at one year, or during good behavior, is the same as one which adds to those provisions the declaration that the incumbent shall not be dismissed therefrom. Whatever the form of the statute, the officer under it does not hold by contract. He enjoys a privilege revocable by the sovereignty at will; and one legislature cannot deprive its successor of the power of revocation. *Butler* v. *Pennsylvania, supra; Stone* v. *Mississippi, supra;* Cooley's Const. Lim. 283; *United States* v. *McDonald,* 128 U. S. 471, 473.

In the second place, section 1229 and Art. 36 of section 1624 of the Revised Statutes are a reproduction in the revision of the act of July 13, 1866, section 5, *supra;* and in *Blake* v. *United States, supra,* the court decided that that act only operated to withdraw from the President the power previously existing in him of removing officers at will, and without the concurrence of the Senate; and that there was no intention to withdraw from him the power to remove with the advice and concurrence of the Senate. If that construction of the statute be correct (and we see no cause for altering our view) it necessarily follows that it was not intended to place an officer where he never before had been — beyond the power of Congress to make any provision for his removal even by the Executive who appointed him.

It is claimed, however, that the construction so given to the act of 1866 was induced by the consideration of certain other statutes *in pari materia,* and that the reintroduction of it in the revision, unaccompanied by those other statutes, would render that construction inapplicable now. We do not think so. We have already considered the act of 1866 in its historical relations, and from the circumstances of its enactment deduced its meaning. When it was reënacted with all other

statutes .of general interest, the political exigency which furnished the primary motive for its reënactment had drifted away with the lapse of time; but we do not think it can avail to give to a statute which, after all, is but a reënactment in the exact language of the original act, a meaning almost directly the reverse of that given to the original act. To give such effect to the action of Congress in codifying the statutes would go far to subvert all decisions and introduce chaos into our jurisprudence.

Thus far we have preferred to decide the case upon the broad grounds above stated, and, therefore, considered it as if the term of office enjoyed by the appellant was what he claims it to have been — a term for life. In fact, however, even if that were true as to other officers, it was not true as to him. The statute applicable to his case is section 1520 of the Revised Statutes, which fixes the academic course at six years; and when he entered the service under the regulations in such cases provided he executed a bond to serve for eight years, unless discharged by competent authority, thus recognizing his liability to be discharged.

As to the fourth proposition of appellant, that in enacting the statute of 1882 Congress assumed the power of appointment which belongs to the Executive, we do not so regard the act. Congress did not thereby undertake to name the incumbent of any office. It simply changed the name, and modified the scope of the duties. This we think it had the power to do.

We think, too, that the appellant came within the terms of the act of 1882. There is a very plain distinction between this case and that of a cadet engineer, fully explained in *United States* v. *Redgrave;* 116 U. S. 474. The statute in express terms provides that "the academic course of cadet midshipmen shall be six years." If the Navy Department had assumed to make any regulations by which the final graduation should take place in less time, such regulations would have been void. But it did not so assume. It arranged for a two years' course afloat as a part of the academic course, and exacted a preliminary examination to test the cadet's qualifications therefor. But the cadet afloat was a member of the

academy. He still was subject to a final examination at that institution, and without such examination successfully sustained never became a graduate. He was not so denominated until then, either in the Naval Register or elsewhere; and it was not until that final test had been sustained that, either by the practice of the academy, or by the provision of the statute he did or could receive his certificate of graduation.

The judgment of the Court of Claims is

*Affirmed.*