**Anita J. RING, Appellant,**

**v.**

**Honorable James R. SCHLESINGER and Honorable John W. Warner, Appellees.**

**No. 72–1568.**

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 24, 1973.

Decided Aug. 16, 1974.

---

Robb, Circuit Judge, dissented and filed opinion.

Ralph J. Temple, Washington, D. C., with whom Melvin L. Wulf, New York City, was on the brief, for appellant.

Jason D. Kogan, Asst. U. S. Atty., with whom Harold H. Titus, Jr., U. S. Atty., and John A. Terry, Asst. U. S. Atty., were on the brief, for appellees.

Before WRIGHT and ROBB, Circuit Judges and MATTHEWS,* Senior United States District Judge for the United States District Court for the District of Columbia.

MATTHEWS, Senior District Judge:

A teacher, hired to teach Navy dependents at the United States Naval Station on Midway Island for a one-year probationary period, was discharged during such trial period pursuant to Navy Civilian Personnel Instructions (NCPI) 352.4–8 governing termination of employment during probation.

Suit was instituted by the teacher against the Secretary of Defense and the Secretary of the Navy seeking a declaratory judgment that her dismissal denied her freedom of speech under the First Amendment and procedural due process under the Fifth Amendment.

The teacher moved for summary judgment. The Government responded with a similar motion. Summary judgment was granted by the District Court to the Government, and the teacher appealed.

I

On July 14, 1965, appellant contracted with the Department of the Navy to serve as a secondary teacher in the Navy Dependents School (George Cannon High School) at the United States Naval Station on Midway Island for the period from August 17, 1965, to June 7, 1966. In addition to her salary, appellant was to receive travel and transportation allowances. Thereafter, in accordance with this agreement, she entered upon her teaching duties.

On April 17, 1966, appellant and two other colleagues prepared a memorandum entitled "Richard Bushman's incompetency and lack of ethics as principal of George Cannon School." This memorandum [1] stated:

"We would like to bring to your attention a number of incidents that have occurred in George Cannon High School which warrant your consideration. We believe that there has been an almost total breakdown of morale and discipline because the principal, Mr. Bushman, has not carried out his duties competently and has on the contrary disregarded even the most basic professional ethics. He has indicated that his attempts to carry out policies have met with staunch parental disapproval. We believe it is Mr. Bushman's duty as principal to see that school policies, approved by the school board and teachers, are enforced despite the opposition of any student or parent."

At the same time, each teacher prepared her own personal statement criticizing administrative actions and specifying events and policies which she believed to be mismanagement of the school. Appellant's personal statement in its entirety is set forth in the Appendix to this opinion.

Mrs. Ring sent the memorandum of April 17, 1966, and the teachers' personal statements to four persons. The recipients were: Captain J. M. Savacool, Commanding Officer of the United States Naval Station, Midway Island; Richard R. Meyering, Superintendent, Department of Defense Dependent Schools for the Pacific area; Edwin G.

---

* Sitting by designation pursuant to 28 U.S.C. § 294(c).

1. Appendix, p. 43. The memorandum was signed by Anita J. Ring, Janice A. Faris, and Nora Burgess.

Francisco, Coordinator, Department of Defense Dependent Schools;[2] and Virginia J. March, a representative of the Overseas Education Association of the National Education Association. Only Captain Savacool lived and worked at Midway Island.

The record indicates that after receiving the memorandum and statements, Captain Savacool instructed the School Advisory Board to investigate the allegations made by Mrs. Ring and the other two teachers. The Board met five times, but Mrs. Ring appeared before it only once, at which time the main inquiry was directed to why she had not sent her memorandum through channels.[3]

Following its investigation, the Board submitted a written report to Captain Savacool, finding that there was no support for the teachers' allegations. It recommended that "(1) Mrs. Ring's employment as a secondary teacher be terminated at the earliest possible opportunity, by reason of undesirable suitability characteristics. (2) That Mrs. Faris be issued a letter of caution concerning her actions. (3) That Mrs. Burgess be verbally reprimanded for her actions. (4) That this summary, and the attachments be retained by the command for reference." Appendix, p. 118.

On May 14, 1966, Captain Savacool gave Mrs. Ring written notice that he proposed to terminate her services as a teacher effective May 20, 1966, in accordance with NCPI 352.4–8 "which provides for the separation of an employee during the trial period if it becomes apparent that the employee has undesirable suitability characteristics." Appendix,

p. 25. Further he stated that she had made "statements which were slanderous and defamatory about the officials of the Dependents' School"; that she had "transmitted these slanderous and defamatory statements by letters to several persons in other locations"; and that these statements had "created friction and discord among the school faculty and [had] seriously hampered the proper administration of the school system." Id.

On May 20, 1966, Mrs. Ring presented an eight-page, typewritten letter in reply to Captain Savacool's notice of the proposed termination of her services. On the same day, she received written notification from Captain Savacool effecting her termination. She complied with an order to leave Midway Island on May 25, 1966, without allowances for travel and transportation.[4]

In suing the Secretary of Defense and the Secretary of the Navy seeking a declaratory judgment that her dismissal was in contravention of her constitutional rights, appellant asked that the defendants be compelled to expunge from the records of the Department of the Navy and the Department of Defense and all other records under their control all references to her dismissal including the ostensible reasons therefor.

We first consider appellant's procedural due process claim.

II

The District Court found that in effecting appellant's discharge, Captain Savacool had followed the procedures of the pertinent Navy Civilian Personnel Instructions (NCPI).[5]

---

2. The Government refers to Mr. Francisco as "of the Naval Overseas Employment Office." Mr. Francisco and Mr. Meyering forwarded to the Commanding Officer all materials they received from Mrs. Ring including her covering letters, and Mr. Meyering also informed the principal, Mr. Bushman, of such materials.

3. It appears that "channels" referred to the Principal, the School Officer, and the School Board—in that order—to be contacted be-

fore the Commanding Officer. Appendix, p. 97.

4. Under appellant's employment agreement she was not to receive travel and transportation allowances if she did not complete the school year within the terms of such agreement. Appendix, p. 16.

5. Pursuant to 5 U.S.C. §§ 3301 and 3302, President Eisenhower issued Executive Order No. 10577 which, among other things, (1) authorized the Civil Service Commission

It was understood in Mrs. Ring's employment agreement that all Navy Civilian Personnel Instructions applied to her appointment and service. Her discharge was grounded on undesirable suitability characteristics. In part, Navy Civilian Personnel Instruction 352.4–8a provides:

"Termination During Probation is the appropriate action when:

"(1) A career or career-conditional employee, during his probationary period, fails after a full and fair trial to demonstrate that he possesses the skills and character traits necessary for satisfactory performance as a career employee. (A full and fair trial is whatever period (within the one-year probationary period) is necessary to appraise his performance and conduct against appropriate standards and to reach a considered judgment whether he should be retained or separated; * * *). The action may be based upon deficiency in duty performance, lack of aptitude or cooperativeness, or upon undesirable suitability characteristics evidenced by his ac-

tivities either during or outside official working hours. * * * "

. Mrs. Ring was given notice, the reasons for her proposed separation, the effective date thereof, was advised of her right to reply personally and/or in writing, received consideration of her reply, and a final decision terminating her employment—all in compliance with NCPI 352.4–8b.[6]

However, Mrs. Ring contends that by virtue of her contract she had a property interest or an expectancy of continued employment and benefits which could not be divested without a due process hearing. Conversely, the Government maintains that Mrs. Ring's discharge without a hearing did not constitute a violation of due process. Both parties rely on Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L. Ed.2d 548 (1972) and Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L. Ed.2d 570 (1972). These cases do not concern an employee discharged during the term of his contract, but they bear on procedural rights constitutionally

to except from the competitive service positions for which it was not practicable to examine that were not of a confidential or policy-determining character and (2) made inapplicable Civil Service Rules and Regulations to removal of persons excepted from the competitive service. See 5 C.F.R. §§ 6.-1–6.4 (1964). The Civil Service Commission thereafter excepted from the competitive service: professional positions in overseas Military Dependent School Systems. 5 C.F. R. § 213.3106(b)(1) and §§ 1601.5–1601.6 (1964); NCPI 933.4–1(a). The head of each agency (e. g., the Secretary of the Navy) is permitted to establish any regulations or practices necessary to effect the appointment, position change or removal of those individuals in the excepted service. 5 C.F.R. § 302.102(a) (1964). Upon this authority, the Secretary of the Navy promulgated the Navy Civilian Personnel Instructions (NCPI).

**6.** NCPI 352.4–8b reads:
"b. Procedure when separation is proposed because of deficiencies in performance [or] conduct after entrance on duty ('post-appointment' conditions subparagraph 4–8a(1) above).
"(1) The probationer in this situation shall be given:

"(a) Five days' advance written notice.
"(b) Reasons for the separation (see subparagraph (2) below).
"(c) Effective date.
"(d) Right to reply and to consideration of reply.
"(e) Final decision.
"(f) Notice of his right to appeal to the Civil Service Commission on allegations that the separation involves discrimination prohibited by 4–8a(1). An appeal may be filed anytime after receipt of the advance notice of such decision but not later than ten days after the effective date of the action.
"(2) The information in the notice of proposed separation must, as a minimum, state the activity's conclusions concerning the inadequacies of the employee's performance or conduct. Thus the notice need not cite complete and specific reasons as described in NCPI 750.5. It is, however, good personnel practice to furnish every separated probationer with enough factual information (as distinguished from conclusions) to make the reason for his separation clear. Accordingly, to the maximum extent possible, conclusions should be supported by brief statements of the facts on which the conclusions are based, e. g., 'excessive absence without leave, you were absent without leave on three occasions.' "

guaranteed public employees in connection with their dismissal from employment.

In *Roth, supra,* an assistant professor was hired for a fixed term of one academic year and had no tenure. His contract was not renewed at the end of the academic year. He sued, claiming that the failure of university officials to give him notice of any reason for nonretention and an opportunity for a hearing violated his right to procedural due process. The Supreme Court ruled that "he did not have a *property* interest sufficient to require the University authorities to give him a hearing when they declined to renew his contract of employment." 408 U.S. at 578, 92 S.Ct. at 2710. (Emphasis in original.)

In *Sindermann, supra,* a state college declined to rehire a teacher whose written contract had no tenure provision and had terminated. Unlike *Roth,* the teacher alleged that he had a property interest in continued employment in that he was entitled to job tenure under a *de facto* tenure program, arising from rules and understandings formulated and fostered by the college. The Court held that proof of these allegations would establish the teacher's legitimate claim of entitlement to continued employment absent sufficient cause for discharge. In these circumstances the Court ruled that the teacher must be given an opportunity to prove his allegations, and that such proof would obligate the college to grant a hearing where the teacher could be informed of the grounds for his nonretention and challenge their sufficiency. 408 U.S. at 601–603, 92 S.Ct. 2694.

While a "property" interest protected by procedural due process did not exist in *Roth,* the Supreme Court there noted that a property interest may be created by statute or by contract, saying:

"To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined. It is a purpose of the constitutional right to a hearing to provide an opportunity for a person to vindicate those claims.

"Property interests, of course, are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law —rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." 408 U.S. at 577, 92 S.Ct. at 2709.

The Government's rationale is that appellant's property interest in employment with the Department of the Navy was created and defined by the terms of her appointment, that since she was terminated prior to the expiration of her contract, any property interest that she may have had in the contract, insofar as her procedural rights were concerned, was governed by the specific terms of the agreement, including the applicable provisions of the NCPI which did not provide for a hearing for teachers serving a one-year probationary period; that as a probationary employee, appellant's employment could be terminated at any time within the one-year period for any one of a number of reasons stated in NCPI 352.4–8a as long as there was compliance with the procedure set forth in NCPI 352.4–8b. In these circumstances the Government contends that appellant had no right to a hearing.

■ The kinds of "property" which are protected by the constitutional guarantee of procedural due process vary widely. What may be required by due process in dealing with one set of interests which it protects may not be required in dealing with another set of interests. Arnett v. Kennedy, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15

(1974).[7] As was said in Cafeteria Workers v. McElroy, 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961), "[t]he very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation," and "consideration of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental action."

In the case here the question is just what process is due Mrs. Ring in the existing factual context. Although claiming a property interest in the benefits of her employment agreement, Mrs. Ring is simultaneously challenging the procedural mechanism established therein for ending her services during her trial period, and is insisting that a due process hearing is mandated by the Constitution. In other words, Mrs. Ring relies upon the employment agreement for the property interest she asserts but seeks to have struck down its procedural provisions as not meeting the due process requirements of the Fifth Amendment. In this respect the case before us has a similarity to aspects of Arnett v. Kennedy, *supra.*

There, Kennedy, a nonprobationary employee in the competitive Civil Service, was dismissed from his position in the Office of Economic Opportunity (OEO) for allegedly having made recklessly false and defamatory statements about fellow employees. Though previously advised of his right under OEO and Civil Service Commission (CSC) regulations to reply to the charges and that the material on which the dismissal notice was based was available for his inspection, Kennedy did not respond to the substance of the charges against him. Instead he brought suit for injunctive and declaratory relief, contending that the standards and procedures established by and under the Lloyd-La-Follette Act, 5 U.S.C. § 7501, for the removal of nonprobationary employees from the civil service unwarrantedly interfere with such employees' freedom of expression and deny them procedural due process.

Section 7501, *supra*, provides for removal of nonprobationary federal employees "only for such cause as will promote the efficiency of the service" and prescribes that the employing agency must furnish the employee with reasons in writing, notice of the proposed removal action and a copy of the charges; give him a reasonable time for a written answer and supporting affidavits; and promptly furnish him the Agency's decision. The Section further provides, however, that "[e]xamination of witnesses, trial, or hearing is not required" but is discretionary with the individual directing the removal. CSC and OEO regulations enlarge the statutory provisions by requiring 30 days' advance written notice before removal and in other respects, and entitle the employee to a post removal evidentiary trial-type hearing at the appeal stage. If the employee is reinstated on appeal, he receives full backpay. Kennedy contended that, absent a full adversary hearing before removal, he could not consistently with due process requirements be divested of his property interest or expectancy in employment.

Declining to recognize the validity of Kennedy's contentions, the Supreme Court held that his discharge did not contravene the Fifth Amendment guarantee of procedural due process. In the plurality opinion by Mr. Justice Rehnquist it is said "that the Lloyd-LaFollette Act, in at once conferring upon nonprobationary federal employees the right not to be discharged except for 'cause' and prescribing the procedural means by which that right was to be protected, did

---

7. This case is No. 72–1118 which was argued November 7, 1973, and decided April 16, 1974. The subject matter above discussed appears on pp. 154 and 155 of 416 U.S. 134, 94 S.Ct. 1633 by Mr. Justice Rehnquist.

**486**

not create an expectancy of job retention in those employees requiring procedural protection under the Due Process Clause beyond that afforded here by the statute and related agency regulations."[8]

■ Mrs. Ring was a probationer, and "[c]ommonly a Government agency may dismiss a probationary employee found unqualified for continued employment simply 'by notifying him in writing as to why he is being separated and the effective date of the action.'" Sampson v. Murray, 415 U.S. 61, 94 S. Ct. 937, 39 L.Ed.2d 166 (1974). In Cafeteria Workers v. McElroy, 367 U.S. 886, 896, 81 S.Ct. 1743, 1749, 6 L.Ed.2d 1230 (1961) Mr. Justice Stewart said for the court:

> "It has become a settled principle that government employment, in the absence of legislation, can be revoked at the will of the appointing officer. In the Matter of Hennen, 13 Pet. 230, 246, 259 [10 L.Ed. 138]; Crenshaw v. United States, 134 U.S. 99, 108 [10 S.Ct. 431, 434, 33 L.Ed. 825]; Parsons v. United States, 167 U.S. 324, 331–334 [17 S.Ct. 880, 882–883, 42 L.Ed. 185]; Keim v. United States, 177 U.S. 290, 293–294 [20 S.Ct. 574, 575, 44 L.Ed. 774]; Taylor and Marshall v. Beckham (No. 1), 178 U.S.

548, 575–578 [20 S.Ct. 890, 900–901, 44 L.Ed. 1187]. This principle was reaffirmed quite recently in Vitarelli v. Seaton, 359 U.S. 535 [79 S.Ct. 968, 3 L.Ed.2d 1012]. There we pointed out that Vitarelli, an Interior Department employee who had not qualified for statutory protection under the Civil Service Act, . . . 'could have been summarily discharged by the Secretary at any time without the giving of a reason . . . 359 U.S., at page 539 [79 S.Ct. at page 972].'"

The Navy Civilian Personnel Instructions afforded Mrs. Ring more procedural protection than is ordinarily accorded probationary government employees. 5 C.F.R. § 315.804 (1964).[9]

We consider the circumstances of this case, the provisions of the teacher's agreement with the Navy, the fact that she was serving a trial period, the precise nature of the Navy's function on the remote island of Midway,[10] and the private interest of the civilian probationary teacher affected by governmental action.

The Navy Civilian Personnel Instructions establish the procedural framework in which a discharge determination may be made as to a probationary teacher in the excepted service. The teacher is en-

---

8. Arnett v. Kennedy, *supra*, 416 U.S. at p. 163, 94 S.Ct. 1633 at p. 1649. The Chief Justice and Mr. Justice Stewart joined in the opinion of Mr. Justice Rehnquist. In a separate opinion, Mr. Justice Powell, joined by Mr. Justice Blackmun, reached the same ultimate conclusions as are stated in the plurality opinion but on the basis of different reasoning. Mr. Justice White concurred in part and dissented in part. The other three Justices dissented.

9. 5 C.F.R. § 315.804 reads:
   "When an agency decides to terminate an employee serving a probationary or trial period because his work performance or conduct during this period fails to demonstrate his fitness or his qualifications for continued employment, it shall terminate his services by notifying him in writing as to why he is being separated and the effective date of the action. The information in the notice as to why the employee is being terminated shall, as a minimum,

consist of the agency's conclusions as to the inadequacies of his performance or conduct."

10. Section 48 of the Hawaii Omnibus Act, Pub.L. No. 86–624 (July 12, 1960), provides:
   "Until Congress shall provide for the government of . . . Midway Island . . . all executive and legislative authority necessary for the civil administration of . . . Midway Island . . ., and all judicial authority . . . shall continue to be vested in such person or persons and shall be exercised in such manner and through such agency or agencies as the President of the United States may direct or authorize . . ."
   Pursuant to this authority, President Kennedy issued Executive Order No. 11048, continuing the Navy's responsibility for the civil administration of the island that was first established by Executive Order 199–A in 1903. 48 U.S.C.A. prec. 491 nt.

titled (1) to notice of her proposed separation and of the Navy's conclusions as to her inadequacies of performance or conduct, (2) to an opportunity to respond, (3) to have her reply considered prior to termination of her services, and (4) to a final decision.

We believe that the agreement here, in at once providing for a one-year probationary term and prescribing the procedural means for the earlier ending of the trial period, did not create an expectancy of job retention requiring procedural protection under the due process clause beyond that afforded by the Navy Civilian Personnel Instructions.[11]

In the posture of this litigation, however, our view of the Navy Civilian Personnel Instructions is not dispositive.

### III

Mrs. Ring alleges in her complaint that she was dismissed on an impermissible basis—in retaliation for her exercise of her freedom of speech rights under the First Amendment. She claims that in good faith she simply sought to call attention through the Commanding Officer to what she believed was maladministration at the school where she worked, that her statements critical of the principal, Mr. Bushman, were within the First Amendment protection of freedom of speech, and that her dismissal may not lawfully be predicated on the exercise of her First Amendment rights.

"For at least a quarter-century, [the Supreme] Court has made clear that even though a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interest—especially, his interest in freedom of speech. For if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited. This would allow the government to 'produce a result which [it] could not command directly.' Speiser v. Randall, 357 U.S. 513, 526 [78 S.Ct. 1332, 1342, 2 L.Ed.2d 1460]. Such interference with constitutional rights is impermissible." Perry v. Sindermann, 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972). This principle has been applied regardless of the employee's contractual or other claim to a job.

Reliance is placed by appellant on Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). The issue there was whether a public school teacher could be dismissed for writing and publishing in a newspaper a letter criticizing the Board of Education's allocation of school funds between educational and athletic programs and the Board's and superintendent's method of informing, or preventing the informing of, the school district's taxpayers of the real reasons why additional tax revenues were being sought for the schools.[12] The Supreme Court bal-

---

11. While the NCPI make no provision for the examination of witnesses nor any trial or hearing, they do provide limited procedural protection in that they do not permit summary dismissal without inquiry. *Cf.* Connell v. Higginbotham, 403 U.S. 207, 208, 91 S.Ct. 1772, 29 L.Ed.2d 418 (1971). "The Fifth Amendment does not require a trial-type hearing in every conceivable case of government impairment of private interest." Cafeteria Workers v. McElroy, 367 U.S. 886, 894, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961). " '[D]ue process,' unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances." Anti-Fascist Committee v. McGrath, 341 U.S. 123, 162, 71 S.Ct. 624, 643, 95 L.Ed. 817 (1951) (concurring opinion).

12. At a hearing the Board charged that numerous statements in the letter were false and that the publication of the statements unjustifiably impugned the Board and school administration. The Board found all the statements false as charged and concluded that publication of the letter was "detrimental to the efficient operation and administration of the schools of the district" and that "the interests of the school require[d] [the

anced the teacher's interest as a citizen in commenting publicly on important issues against the State's interest in promoting the efficiency of its employees' public service and held that the teacher's freedom of speech rights had been violated, reversing the Illinois Supreme Court.

It was pointed out by the Court in *Pickering* that the statements of the teacher which were substantially correct regarded matters of public concern and presented no questions of faculty discipline or harmony, and hence that these statements afforded no proper basis for the Board's action in dismissing the teacher. The statements of the teacher which were false likewise concerned issues then currently the subject of public attention and as they were neither shown nor could be presumed to have interfered with the teacher's performance of his teaching duties or the schools' general operation, the Court viewed them as entitled to the same protection as if they had been made by a member of the general public, and, absent proof that those false statements were knowingly and recklessly made, did not justify the Board in dismissing the teacher from public employment.

The problem in any case is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the state, as an employer, in promoting the efficiency of the public services it performs through its employees. *Pickering, supra,* at p. 568, 88 S.Ct. 1731, 1734.

"Because of the enormous variety of fact situations in which critical statements by teachers and other public employees may be thought by their superiors, against whom the statements are di-

rected, to furnish grounds for dismissal," the Supreme Court in *Pickering* declined to "attempt to lay down a general standard against which all such statements may be judged." However, the Court indicated "some of the general lines along which an analysis of the controlling interests should run." 391 U.S. 569, 88 S.Ct. 1735.

Among the considerations thus mentioned in *Pickering,* but not present as issues therein, are: (1) Whether the statements are "directed towards any person with whom appellant would normally be in contact in the course of his daily work as a teacher." 391 U.S. at 569–570, 88 S.Ct. at 1735; (2) Whether there is a "question of maintaining either discipline by immediate superiors or harmony among co-workers . . . " *Id.* at 570, 88 S.Ct. at 1735; (3) Whether "the relationship between superior and subordinate is of such a personal and intimate nature that certain forms of public criticism of the superior by the subordinate would seriously undermine the effectiveness of the working relationship between them . . . " *Id.* at 570, fn. 3, 88 S.Ct. at 1735; (4) Whether the statements "interfered with the regular operation of the schools generally." *Id.* at 573, 88 S. Ct. at 1737. The Supreme Court did not indicate how it would have ruled had any or all of these elements been present in *Pickering.*

The District Court concluded that all of the above-mentioned elements, notably absent in *Pickering,* were present in the instant case. We are of the opinion that the evidentiary record in this case is insufficient to support that conclusion. At the outset, we note significant differences between the record here and that in *Pickering.*

teacher's dismissal]" under the applicable statute. There was no evidence at the hearing as to the effect of the teacher's statement on the community or school administration. The Illinois courts, reviewing the proceedings solely to determine whether the Board's findings were supported by substantial evidence and whether the Board could reasonably conclude that the publication was "detrimental to the best interests of the

schools," upheld the dismissal, rejecting the teacher's claim that the letter was protected by the First and Fourteenth Amendments, on the ground that as a teacher he had to refrain from making statements about the schools' operation "which in the absence of such position he would have an undoubted right to engage in." 391 U.S. pp. 564–567, 88 S.Ct. pp. 1733–1734.

Pickering published his statements critical of the School Board in a newspaper. Mrs. Ring sent her statements critical of the school principal to four persons only, all of whom were concerned with the school, three being officials of the Defense Department. The record does not show that Miss March, the only recipient not a Defense Department official, disseminated or otherwise dealt with the statements or caused anyone any harm. See Swaaley v. United States, 376 F.2d 857, 180 Ct.Cl. 1 (1967). The record is silent as to how or by whom Mrs. Ring's coworkers were informed of her memorandum.

A hearing was held in *Pickering* and the testimony of all witnesses was before the reviewing courts. From this evidentiary material the Supreme Court determined (1) that some of Pickering's statements were correct, (2) that some were false but that proof was lacking that they were knowingly and recklessly made, and (3) that the School Board's finding that Pickering's statements harmed the school system was without support in the record.[13] On the other hand, Mrs. Ring has had no hearing, and there was no evidentiary material based on the sworn testimony of witnesses from which the District Court might have gleaned the facts. There was no evidence that the statements made by Mrs. Ring were true or false, or, if false, whether she knew they were so, or

whether she made the statements with reckless disregard of their truth or falsity.[14]

Of course, "the knowingly false statement and the false statement made with reckless disregard of the truth, do not enjoy constitutional protection." Garrison v. Louisiana, 379 U.S. 64, 75, 85 S.Ct. 209, 216, 13 L.Ed.2d 125 (1964). But even "where the utterance [or statement] is false, the great principles of the Constitution which secure freedom of expression in this area preclude attaching adverse consequences to any except the knowing or reckless falsehood." *Garrison, supra,* at p. 73, 85 S.Ct. at p. 215.

In granting summary judgment to the Government without a hearing, the District Court held that the Commanding Officer had balanced the effect of Mrs. Ring's statements "on the efficiency and morale of the teachers, the principal, the school board, and the military personnel whose dependents attended the school, against the employment interest of a civilian teacher on probationary status." Appendix, p. 154. Further the court said that the Commanding Officer's dismissal of Mrs. Ring should not be disturbed, and that it was not for the court "to second-guess the judgment of the Commanding Officer who had before him all of the evidence submitted in this case and far greater first-hand knowl-

---

13. Where constitutional rights are in issue the Supreme Court has regularly held that an independent examination of the record will be made in order that the controlling principles may be applied to the actual facts of the case. E. g., Norris v. Alabama, 294 U.S. 587, 55 S.Ct. 579, 79 L.Ed. 1074 (1935) ; Pennekamp v. Florida, 328 U.S. 331, 66 S.Ct. 1029, 90 L.Ed. 1295 (1946) ; New York Times Co. v. Sullivan, 376 U.S. 254, 285, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) ; Pickering v. Board of Education, 391 U.S. 563, p. 578, fn. 2, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968).

14. The Commanding Officer, prior to making any complaint against Mrs. Ring, directed the School Advisory Board to look into the charges made against the principal, Mr. Bushman, by Mrs. Ring and two other teachers. While various persons appeared

before the Board, Mrs. Ring was not present at any of these interviews except when the Board questioned her as to why she had not sent her statements through channels. Thereafter, the Board submitted a report to the Commanding Officer, but failed to supply the content, either verbatim or in summary form, of the statements of those interviewed. The Board gave the Commanding Officer its *opinion* that Mrs. Ring's actions were malicious and vindictive, her statements slanderous and defamatory, and the cause of friction and disruption of the school. Appendix, pp. 117–118. This *opinion* of the Board, of course, may not be regarded by the District Court as establishing *facts* in the dispute here over First Amendment rights. We also note that there is nothing in the record to show that Mrs. Ring ever saw the Board's report or knew of its content prior to the filing of the present action.

edge of the needs of those under his command." *Id.*

█ We do not perceive from the record that Captain Savacool was even aware of free speech rights being involved, much less that he did the "balancing" of interests attributed to him by the District Judge. Moreover, we do not agree with the District Court that there was no need to question the judgment of the Commanding Officer. The balancing here of First Amendment freedoms against an asserted governmental interest requires the judgment of the District Court. See A Quaker Action Group v. Morton, 148 U.S.App.D.C. 346, 352, 460 F.2d 854, 860 (1971).

It was also the view of the District Judge that "the Commander's references to plaintiff's statements as *one ground* of her dismissal cannot reduce the controversy here solely to a dispute over first amendment rights" (emphasis added), Appendix, p. 151; yet he regarded the Commanding Officer as having "assigned the following grounds for the proposed termination: 1. that plaintiff had made statements which were slanderous and defamatory about school officials; 2. that plaintiff had transmitted those statements to several persons in other locations; 3. that those statements had created friction and discord among the school faculty and had seriously hampered the proper administration of the school system." Appendix, p. 149.

Certainly the term "undesirable suitability characteristics" used in the NCPI and in the Commanding Officer's notice of proposed separation, may embrace various deficiencies or inadequacies. However, while the NCPI do not require the Commanding Officer to "cite complete and specific reasons," they do stipulate that the "information in the notice of proposed separation *must, as a minimum, state the [Navy's] conclusions concerning the inadequacies of the employee's performance or conduct.*" (Emphasis supplied.) [15]

It is manifest that all the reasons specified by the Commanding Officer for the teacher's dismissal rest on the teacher's critical statements concerning the principal. No other conclusion concerning the teacher's inadequacies of performance or conduct appears in the notice. Since in this action the teacher claims (1) that these statements were protected by the First Amendment guarantee of freedom of expression, and (2) that she was unlawfully dismissed in retaliation for her exercise of her freedom of speech rights, the teacher has thus raised a constitutional issue. See Perry v. Sindermann, 408 U.S. 598, 92 S.Ct. 2694, 33 L.Ed.2d 570.

Mrs. Ring has yet to show that she was, in fact, so dismissed. The District Court foreclosed any opportunity to make this showing when it granted summary judgment to the Government. We think that there is a genuine dispute as to whether appellant was dismissed on an impermissible basis—as a reprisal for the exercise of constitutionally protected rights.

██ The record here does not permit a resolution of this issue by summary judgment.[16] Perry v. Sindermann, *supra,* 408 U.S. 598, 92 S.Ct. 2694, 33 L.Ed.2d 570; Hess v. Schlesinger, 159 U.S.App.D.C. 51, 486 F.2d 1311 (1973). We therefore reverse and remand for trial.

So ordered.

---

15. See footnote 6 herein for the text of NCPI 352.4–8b(2).

16. Summary judgment is authorized only if "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). Sartor v. Arkansas Gas Corp., 321 U.S. 620 (1944). The function of the court on a summary judgment motion "is limited to ascertaining whether any factual issue pertinent to the controversy exists; it does not extend to resolution of any such issue." Nyhus v. Travel Management Corporation, 151 U.S.App.D.C. 269, 271, 466 F.2d 440, 442 (1972). On the appeal here from summary judgment for the Government, this court as the reviewing tribunal must give to appellant as the party against whom summary judgment was entered the most favorable view of the record. Libby v. L. J. Corporation, 101 U.S.App.D.C. 87, 247 F.2d 78 (1957).

## APPENDIX TO THE OPINION OF THE COURT

"Statement by Mrs. Anita J. Ring, librarian-counselor, and until recently classroom teacher of English and social studies.

"In August, before the school year had begun, Mr. Bushman increased the work-load and reduced the efficiency of all high school teachers by misassigning their classes. He had the science teacher teaching math, the math teacher teaching physical education, the Spanish teacher teaching speed reading, etc.

"I was prepared to teach almost any English literature or composition. He gave me journalism, a subject I had never studied or taught, and told me to teach it without a text, since we had no journalism books. I also had some students the same period who had been told the class was creative writing. There was no text for creative writing either.

"All students in the 10th, 11th, and 12th grades who were not in journalism-creating-writing class were put into 'literature.' Does one use a 10th, 11th, or 12th grade text for such a course? Does one teach grammar and composition in 'literature'?

"But that course was not as bad as my twenty 10th, 11th, and 12th grade students (all students in those grades in the high school, reading from grade level three to college) who were in the American-history-government class, where my only text was an 8th grade level American history book.

"Long before the end of first semester I asked Mr. Bushman to change the high school schedule so students would be in more traditional classes divided along grade levels. He admitted that this was desirable but said it was impossible. I went through every high school student's record and showed him how it could be done. Later he announced to the high school faculty that he and I had come up with almost identical new schedules, gave my schedule to Mrs. Turnbull to make copies for everyone, and this is the class schedule we have been using for second semester.

"When a remedial reading teacher was hired, Mr. Bushman again had opportunity to demonstrate his skill with curriculum planning. He sent a notice to teachers to recommend students for remedial reading, but his notice did not go to all teachers who had students to recommend. Then the remedial reading teacher with his supervision made up schedules for recommended students. When these schedules were sent to teachers, not all teachers received them. When teachers checked them, they discovered primary students were in remedial reading classes with senior high school students and that first grade students were scheduled for a full hour of remedial reading. Also primary students who start to school at 8:30 were scheduled for reading at 8:00.

"When I was relieved of my classroom duties, I asked Mr. Bushman what my library-counseling duties would be so I could plan the rest of the year. He told me one thing on Thursday and changed it Monday. Tuesday at 8:00 I tried to see him about it, but he had not come to school yet. Between 11:00 and 12:00 I tried but he had left early for lunch. I tried to see him after lunch, but was told he was at the reef and would not be back all afternoon. I left a message saying I would like to have a written schedule so my duties could not be so easily changed.

"He found me the next morning, hurled a few insulting remarks at me about my not being willing to do my share of the work, and then made up a schedule. Mr. Meyering arrived on Midway the next day.

"Mr. Bushman's curriculum planning and discipline are of the same quality. Last fall when I found the high school students noisy and insolent throughout the school, inside and outside the classroom, I recommended that some general policy be established for all students. There was no way to control students outside a classroom. In consultation with Mr. Bushman a code of conduct was written and approved by the school board. Every student was given a copy to sign, but nothing ever came of the

code of conduct. For it to work Mr. Bushman had to keep a citizenship class one day a week. He would not.

"The situation was bad at that time and it continues to deteriorate. Last semester I took one defiant discipline problem to Mr. Bushman. He lectured me, not the student, and said it was a personality conflict. Since then, I do not consult him about my discipline problems. Mr. Bushman is so changeable that the students do not take him seriously. They make more noise and are more insolent and are disrespectful to all teachers. Students lie to me, slam books down on the circulation desk, and are insolent with impunity if they or their parents appeal from me to Mr. Bushman.

"Mr. Bushman has rated my work at George Cannon School for this year as 'satisfactory.' If my work at this school has been no more than average, how is Mr. Bushman's work to be rated?

"The damage that Mr. Bushman has caused at George Cannon School will not end when he leaves the island. All the high school students have been denied education they could have received had there been discipline and had the teachers been properly assigned. How can a man who cannot be trusted to be at work during working hours be given authority over teachers and students? How long will this man be allowed, through indifference or inaction of responsible people, to continue in this profession?" Appendix, pp. 73–75.

ROBB, Circuit Judge (dissenting):

As I read the opinions in Arnett v. Kennedy, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974) the Supreme Court would probably hold that Mrs. Ring had an "expectancy of job retention" or property interest that could not be terminated without procedural due process. I agree with the majority however that Mrs. Ring was accorded procedural due process. An adversary or full evidentiary hearing was not necessary. Sampson v. Murray, 415 U.S. 61, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974); Arnett v. Kennedy, *supra*.

In seeking to wrap Mrs. Ring in the mantle of the First Amendment, the majority focuses only on the statements which she circulated, and assumes that these were the sole basis for her dismissal. The record discloses however that the dismissal was not based on such narrow grounds. She was dismissed because she was the cause of intolerable friction, discord and disruption in the Midway school system.

As the majority opinion notes, the School Advisory Board investigated the allegations made by Mrs. Ring and the other two teachers. The record shows that the Board gave careful consideration to the matter, meeting on five separate days, interviewing Mrs. Ring and other teachers, and reviewing records, reports and written statements. At the conclusion of its investigation the Board reported in part:

> (9) That the teachers residing in the WOQ (Miss Schnieder, Mrs. Gamet, Mrs. Cudo, Miss Urban, Miss Miller, Miss Andrus) consider these letters to be malicious, unfounded, unethical and unprofessional in both content and means of transmission.

> \* \* \* \* \* \*

> (11) That Mrs. Ring:
> \* \* \* \* \* \*
> (g) Has consistently and publicly spoken in a derogatory manner of her administrative superior, Mr. Bushman.

> (h) Has consistenly [sic] and publicly spoken in a derogatory manner of the school, the station, station personnel, the Navy and the military service.

> (i) Has been the subject of discussion by the principal, the Schools Officer and the Executive Officer throughout the school year for her inability to maintain classroom discipline, her apparent dislike for her students, and her inability to successfully carry out voluntary tasks, ie., [sic] Reef Reporter, Senior Advisor, Drama Club. That she was not recommended for termina-

tion early in the school year solely due to the paucity of qualified teachers.

(j) Has consistently stated that she intends to "Get Bushman."

(k) Admitted to the Board that her reason for forwarding the subject instruments to other officials was "to get something in Bushman's jacket."

(l) Instigated, collected and forwarded the instruments. That her statement is generalized, incomplete, intentionally half-true; that it was designed to discredit and injure an individual, rather than to "improve the school." That these instruments, as well as statements made by her, are defamatory and slanderous to her superior.

The Board concluded:

It is the opinion of the Board that Mrs. Ring has, throughout the school year, sought to undermine the school principal; that she has knowingly and intentionally sought to do him professional injury; that she instigated and supervised the preparation of the statements, and forwarded them to various agencies outside this command in an effort to bring disrepute upon her administrative superior; that her actions are malicious and vindictive; that her statements, both oral and written are slanderous and defamatory, and have caused friction and disruption of the school faculty, and have adversely affected school administration.

The Board recommended that:

Mrs. Ring's employment as a secondary teacher be terminated at the earliest possible opportunity, by reason of undesirable suitability characteristics. [J.A. 113, 114, 115, 117, 118].

Captain Savacool, Commanding Officer of the Midway Naval Station, notified Mrs. Ring in writing that it was proposed to terminate her services. The notification stated in part:

1. You are hereby notified that it is proposed to terminate your services as Teacher (Secondary) as of 20 May 1966. The proposed termination action is in accordance with reference (a) which provides for the separation of an employee during the trial period if it becomes apparent that the employee has undesirable suitability characteristics. You have made statements which were slanderous and defamatory about the officials of the Dependents' School on Naval Station, Midway Island; and you have transmitted these slanderous and defamatory statements by letters to several persons in other locations. These statements have created friction and discord among the school faculty and have seriously hampered the proper administration of the school system.

Mrs. Ring filed an eight-page single-spaced typewritten reply to Captain Savacool's notification that he proposed to terminate her services. Responding in particular to the allegation that her "statements have created friction and discord among the school faculty and have seriously hampered the proper administration of the school system" Mrs. Ring said in part:

a. I did not *create* the friction and discord. Friction and discord preceded the statement by several months.

b. If proper administration of the school system was seriously hampered as a result of the friction and discord growing out of 17 April statements, it was not friction and discord created by my statement alone. Mr. Bushman at an 18 April faculty meeting enflamed the faculty and increased friction and discord.

c. Also friction and discord grew out of distortions of my 17 April statement, out of distortions of my reasons for making the statement, and out of other statements made in confidence to officers of the School Board.

d. Even though the 17 April statement did increase friction and discord, I had to make it to meet professional obligations to student, community, and the profession.

(1) These statements did not *create* friction and discord. There was friction and discord between Mr. Bushman and among teachers with whom I share quarters long before my 17 April statement.

\* \* \* \* \* \*

Friction and discord existed between me and some of the teachers long before 17 April. Our personalities are different. Thrown together constantly in the small Midway community, clashes were inevitable. The 17 April statement may have aggravated the problems or brought them to light, but it did not create them.

\* \* \* \* \* \*

(2) Your charge that my statement created friction and discord among the faculty and seriously hampered proper administration of the school is general and therefore difficult to cope with in specific terms. I have said that friction existed among the teachers and between the principal and myself for many months. That this was increased in the past month is not disputed, but the cause of the greater friction is not entirely due to my statement. Much of the friction after 18 April was created by Mr. Bushman in a faculty meeting held that afternoon. He enflamed the teachers and encouraged friction and discord by misquoting statements made by Janice Faris, by telling half-truths, or outright lies.

\* \* \* \* \* \*

(4) I knew that my statement would make some teachers unhappy. I have explained earlier that, not wanting to cause unnecessary conflict, I cooperated in giving a party I did not wish to give. I have made other compromises to avoid conflict. But I had a professional responsibility to make the statement about Mr. Bushman and I could not compromise my principles just to avoid conflict. [J. A. 125, 126, 127]. (Emphasis in original.)

From this record, and in particular from Mrs. Ring's reply to Captain Savacool's notification, he was quite justified in concluding that she was an abrasive and disturbing element on the base. Her written statements were only the concluding item in a pattern of conflict and discord. As Mrs. Ring said:

Friction and discord existed between me and some of the teachers long before 17 April. Our personalities are different. Thrown together constantly in the small Midway community, clashes were inevitable. The 17 April statement may have aggravated the problems or brought them to light, but it did not create them.

I agree with the district judge that "It is not for this Court to second-guess the judgment of the Commanding Officer who had before him all of the evidence submitted in this case and far greater first-hand knowledge of the needs of those under his command." [J.A. 154. The District Court's opinion is not reported.] The Supreme Court in Sampson v. Murray, 415 U.S. 61, 94 S. Ct. 937, 39 L.Ed.2d 166 (1974), recognized "the well established rule that the Government has traditionally been granted the widest latitude in the 'dispatch of its own internal affairs. . . . .'" In my opinion the decision of the majority violates this rule.

Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), relied upon by the majority, does not justify its decision. Pickering was a school teacher in Illinois. He wrote and published in a newspaper a letter criticizing the School Board and the Superintendent of Schools. Charging that many statements in the letter were false and unjustifiably impugned the Board and the school administration, and that publication of the letter was detrimental to the efficient operation of the schools, the Board dismissed Pickering. There was no evidence as to the effect of the letter on the community as a whole or on the administration of the school system in particular. The Su-

preme Court held that Pickering's right to freedom of speech had been violated. The Court declined to lay down a general standard against which statements by teachers critical of their superiors might be judged; but the Court did indicate certain factors or questions which should be considered in "evaluating the conflicting claims of First Amendment protection and the need for orderly school administration." 391 U.S. at 569, 88 S.Ct. at 1735. These were:

1. Whether the statements were directed towards the person with whom the teacher would normally be in contact in the course of his daily work as a teacher, so that there was a question of maintaining discipline by immediate superiors or harmony among co-workers.

2. Whether the employment relationships with the Board and Superintendent were the kind of close working relationships which required personal loyalty and mutual confidence.

3. Whether the publication damaged the professional reputations of the Board and the Superintendent and would foment controversy and conflict among the Board, teachers, administrators and the residents of the district. The Supreme Court found that none of these elements was present in Pickering's case.

I find decisive differences between the facts in the *Pickering* case and the case before us. Pickering sent his letter to a newspaper in the State of Illinois. Mrs. Ring's activities occurred on a remote naval outpost located on a tiny atoll in the Pacific. Midway is an atoll consisting of two islands, having a total area of two square miles. As Mrs. Ring said in her answer to Captain Savacool, people on the station were "[t]hrown together constantly." The Supreme Court found that "Pickering's letter was greeted by everyone but its main target, the Board, with massive apathy and total disbelief." 391 U.S. at 570, 88 S.Ct. at 1736. Mrs. Ring, on the other hand, admitted that her statement at least aggravated the friction and discord between her, the other teachers, and the Superintendent.

As commanding officer Captain Savacool was required to maintain discipline and efficiency on his station. I think it blinks reality to say that the removal of Mrs. Ring was not consistent with that duty; and in my opinion it was also consistent with the Constitution.

I would affirm the judgment of the District Court.